No. 82,174

STATE OF KANSAS, *Appellee*, v. VICTOR R. MITCHELL, JR.,
*Appellant*.
(7 P.3d 1135)

350

Opinion filed June 2, 2000.

*Debra J. Wilson*, assistant appellate defender, argued the cause, and *Joseph P. Leon*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Victor R. Mitchell, Jr., from his convictions for two counts of intentional second-degree murder for the deaths of brothers Jeff and Randy Hobaugh.

Mitchell claims the trial court erred in failing to give a voluntary manslaughter instruction and in giving an instruction that the jury

"should not" consider Mitchell's refusal to testify rather than "must not"; he also claims prosecutorial misconduct in closing argument.

During the week of April 15, 1998, the Hobaughs made plans to burglarize Mitchell's residence, knowing that he kept a significant amount of marijuana, drug paraphernalia, cash, and firearms at his house.

On April 15, Douglas Dow drove the Hobaughs to the Planeview area of Wichita, Kansas, where Mitchell lived. After two aborted attempts, the Hobaughs burglarized Mitchell's residence at approximately 6:30 p.m. while Mitchell was away having dinner. When Mitchell returned, he knew his house had been "hit." Mitchell discovered that binoculars, a leather jacket, chaps, two guns including a .357 magnum, a satin jacket with the name "Vic" on it, triple beam scales used for weighing drugs, and a pound or a pound and a half of marijuana had been stolen. Mitchell did not call the police.

Dow drove the Hobaughs back to Mitchell's residence at approximately 11:30 that same night as they wanted to return and get some rifles they left behind on Mitchell's bed. Gary Hall testified that the Hobaughs told him that they were probably going to kill Mitchell if he was there when they arrived. Dow did not enter Mitchell's residence but waited in the car. Dow fell asleep, awoke, and eventually drove away without the Hobaughs.

A neighbor called police about midnight when he heard several gunshots in the area. Wichita Police Officer Renay Bryand responded to the "check-shots" call. After searching the area, Officer Bryand discovered the Hobaugh bodies in a drainage ditch near Mitchell's residence. Randy had been shot in the right temple; the left arm, with the bullet exiting the arm and eventually lodging in the nasal cavity; the right forearm; and the left buttock. He also had other graze wounds. Jeff had gunshot wounds to the back of his neck, fracturing cervical vertebras two and three and lacerating the spinal cord; the left shoulder blade; the right buttock, puncturing the intestine several times; and the left thumb. The Hobaughs had no weapons, and no other weapons were found in the area.

Pursuant to a warrant, officers searched Mitchell's residence. They found a trigger housing group for a firearm, a considerable amount of ammunition, a spent .22 caliber bullet in the closet of the spare bedroom, numerous spent .22 cartridges between the slats on the back porch, and an empty box of CCI brand .22 caliber ammunition in the front porch area. A spent bullet casing marked with a small "c" on the bottom was also found approximately 30 to 40 feet from the Hobaugh bodies.

Firearms examiner Gary Miller testified that two of the casings found on the back porch were fired with the trigger housing group, as well as the casing found about 30 to 40 feet from the Hobaugh bodies. Furthermore, the spent cartridge found in the closet was fired from the same firearm as bullet fragments later recovered from the Hobaugh bodies.

Mitchell was charged with the first-degree murders of the Hobaughs. A jury found him guilty of intentional second-degree murder on both counts. Mitchell was sentenced to two consecutive terms of life imprisonment. Mitchell filed a timely notice of appeal. The matter is now before this court.

## I. LESSER INCLUDED OFFENSE INSTRUCTION

Mitchell was charged with two counts of premeditated first-degree murder pursuant to K.S.A. 21-3401(a). The trial court refused to give an instruction on voluntary manslaughter.

Mitchell argues that the trial court erred when it refused to instruct the jury on voluntary manslaughter as a lesser included offense of premeditated first-degree murder.

K.S.A. 21-3403 sets forth:

"Voluntary manslaughter is the intentional killing of a human being committed:
"(a) Upon a sudden quarrel or in the heat of passion; or
"(b) upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211, 21-3212 or 21-3213 and amendments thereto.
"Voluntary manslaughter is a severity level 3, person felony."

The key elements of voluntary manslaughter are whether the killing was intentional and whether there was legally sufficient provocation. *State v. McClanahan,* 254 Kan. 104, 113, 865 P.2d

1021 (1993). Whether a provocation is legally sufficient is an objective rather than a subjective determination. To be legally sufficient to intentionally kill an individual, a provocation must consist of more than mere words or gestures, and if assault or battery is involved the defendant must have a reasonable belief that he or she is in danger of great bodily harm or at risk of death. 254 Kan. at 114.

Mitchell argues that an instruction on voluntary manslaughter should have been given because there was no evidence which would have precluded a jury from determining that the killings were committed upon a sudden quarrel or in the heat of passion. The test is not whether there is *a lack* of evidence which would *prevent* a jury from convicting the defendant of a lesser crime, but whether there is *any evidence*, when viewed in a light most favorable to the defendant, by which a reasonable jury *could* convict a defendant of the lesser crime.

In *State v. Haddock*, 257 Kan. 964, 897 P.2d 152 (1995), the defendant was found guilty of first-degree murder of his wife. Haddock and his wife had been at home alone over the lunch hour and had eaten a light lunch together. According to Haddock, he left the home about 2 p.m. When the Haddocks' daughters came home later that afternoon, they discovered their mother's body in the garage under a woodpile. Investigators discovered evidence which led them to believe that Haddock's wife had been murdered and that her death was not accidental. Haddock insisted to police that he had not been home at the time of his wife's death and that he had been at Wendy's restaurant. On appeal, Haddock argued that the trial court erred when it refused to give an instruction on voluntary manslaughter. Instructions were given, however, on first- and second-degree murder. This court held that the trial court correctly refused the voluntary manslaughter instruction and stated:

"Mere evidence of an altercation, however, does not alone support a finding of sufficient provocation. We have found the evidence insufficient for a voluntary manslaughter instruction in spite of evidence of some kind of altercation between the defendant and victim just before the killing. [Citations omitted.]

"In *State v. Coleman*, 253 Kan. 335, 352-54, 856 P.2d 121 (1993), we clarified prior cases in holding that evidence supporting a lesser included offence instruction may be presented either by the defendant or the State. *In the case at bar, however, neither Haddock nor the State presented evidence of precisely what provoked or preceded Barbara's murder. The person who could have supplied the missing evidence of provocation in this case was the last person to see her alive.* Haddock, however, denied having any kind of altercation with his wife." (Emphasis added.) 257 Kan. at 987.

As in *Haddock*, there is no evidence whatsoever concerning the moments leading up the deaths of the Hobaughs. Mitchell did not testify and there were no eyewitnesses. Neither the State nor the defense presented any evidence which would have led a reasonable juror to find that Mitchell was provoked to a sudden quarrel or acted out of heat of passion.

We hold that the trial court did not err when it refused to give an instruction on voluntary manslaughter when there was no evidence of provocation in the moments just prior to the killings or any facts from which Mitchell could have formed an honest belief that circumstances existed that justified deadly force. There is no evidence that Mitchell was aware of the Hobaughs' statements that they would kill him if he was at home. The Hobaughs were unarmed. See *Bell*, 266 Kan. at 918 (holding that trial court was not required to give instruction on voluntary manslaughter where there was no evidence that victim and defendant had a sudden quarrel or that defendant acted under a heat of passion); *Moncla*, 262 Kan. at 74 (holding that trial court correctly refused to give instruction on voluntary manslaughter where there was no evidence of provocation); *State v. Cheeks*, 258 Kan. 581, 591, 908 P.2d 175 (1995) (holding that although there was evidence of marital discord, there was no evidence of provocation prior to death of defendant's wife and, therefore, trial court correctly refused to instruct jury on voluntary manslaughter); *State v. Dixon*, 248 Kan. 776, 783, 811 P.2d 1153 (1991) (affirming trial court's refusal to give instruction on voluntary manslaughter where there was no evidence of quarrel between defendant and victim prior to shooting); and *State v. Cates*, 223 Kan. 724, 729, 576 P.2d 657 (1978) (holding it was unnecessary to give instruction on voluntary manslaughter as there

was no evidence that defendant had quarrelled with victim in parking lot prior to the killing).

## II. REFUSAL TO TESTIFY INSTRUCTION

Mitchell next argues that the trial court erred when it instructed the jury that it "should not" consider the fact Mitchell did not testify in arriving at its verdict. Mitchell's argument is that the instruction should have used "must not" instead of "should not."

When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. *State v. Mims*, 264 Kan. 506, 514, 956 P.2d 1337 (1998).

PIK Crim. 3d 52.13 addresses a defendant's election not to testify and states that the jury *"must not* consider the fact that the defendant did not testify in arriving at your verdict." (Emphasis added.)

Mitchell requested that the court use an instruction which mirrored PIK Crim. 3d 52.13. Instead, the court instructed the jury that they *"should not* consider the fact that the defendant did not testify in arriving at your verdict." (Emphasis added.) Although Mitchell did not expressly object to the use of the "should not" jury instruction, he did offer an alternate and competing jury instruction using the "must not" language. Mitchell's request that the court use his jury instruction containing the "must not" language sufficed as an "objection."

In *State v. Butler*, 257 Kan. 1043, 1066, 897 P.2d 1007 (1995), *modified on other grounds* 257 Kan. 1110, 916 P.2d 1 (1996), we discussed the use of PIK instructions by a trial court and stated:

" 'The use of PIK instructions is not mandatory, but is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK

instructions and recommendations should be followed.' " (Quoting *State v. Dunn*, 249 Kan. 488, 492-93, 820 P.2d 412 [1991].)

Mitchell argues that because the PIK instruction was amended following *State v. Pennington*, 254 Kan. 757, 869 P.2d 624 (1994), to read "must not" instead of "should not," the use of the instruction "violated what is now a well-established principle of the jury instruction." Failure to use the exact language found in the PIK instruction is not fatal and does not automatically require reversal. Prejudice must still be shown.

This court has previously held that the use of "should not" language in a jury instruction concerning the defendant's election not to testify is not prejudicial and does not require reversal. In *State v. Owens*, 248 Kan. 273, 807 P.2d 101 (1991), the defendant argued on appeal that the trial court erred when it gave an instruction with the "should not" language and that it should have given an instruction using "must not." This court held that the use of "should not" was not prejudicial to the defendant and stated: "Although *should* is not as strong as *must*, the jury was instructed not to consider the fact that Owens did not testify. Before the numbered instructions were read, the jury was instructed to consider and follow the instructions. Owens has shown no prejudicial error." 248 Kan. at 284.

In *Pennington*, this court again considered the use of "should not" language in a jury instruction concerning the defendant's failure to testify. We stated:

"The defendant next claims that the trial court erred in failing to instruct the jury that it *must* not draw inferences from the defendant's failure to testify. The court instructed the jury in accordance with PIK Crim. 3d 52.13 [which at the time read]: 'You should not consider the fact that the defendant did not testify in arriving at your verdict.' The defendant requested that 'should' be replaced by 'must'; the trial court declined the requested modification.

"In support of his contention that the trial court's failure to give the requested instruction was reversible error, the defendant cites *Bruno v. United States*, 308 U.S. 287, 84 L. Ed. 257, 60 S. Ct. 198 (1939), for the proposition that a defendant has a right to have the jury instructed that it *must* not consider a defendant's failure to testify. *Bruno* does not dictate such a result. . . . *Bruno* does not require the mandatory 'shall' language, but did require that the *substance* of the defendant's requested instruction should have been given.

. . . .

"We hold that PIK Crim. 3d 52.13 provides sufficient direction for the jury in its consideration of the defendant's failure to testify, that it 'properly and fairly state[s] the law as applied to the facts in the case,' and that the jury could not reasonably have been misled by the instructions. [Citation omitted.] We further hold that the better practice would be for the trial judge in the context of this instruction to use the stronger term 'must' instead of the term 'should.' However, we conclude that no prejudicial error occurred in the failure to give the instruction requested by the defendant." 254 Kan. at 762-64.

Although there was no reason for the trial court to use the instruction containing the words "should not" when the PIK instruction used "must not," the failure to follow the PIK instruction language in this particular case was not prejudicial to Mitchell and does not require reversal. The jury was instructed that it was not to consider the fact that Mitchell did not testify, and the use of the word "should" instead of the word "must" did not significantly alter the meaning of the instruction so as to prejudice Mitchell.

We highly encourage courts to follow the language found in the PIK instructions unless the facts of the case dictate otherwise. The uniform use of PIK instruction language is a highly desirable goal, a goal which takes very little effort to effectuate. Use of the PIK instruction language helps to protect the rights of criminal defendants in our courts and significantly reduces the number of criminal appeals and issues raised in appeals of criminal cases.

We hold that the trial court did not commit reversible error in this case in using the instruction containing the "should not" language in the jury instruction concerning Mitchell's right to refuse to testify as there is no real possibility that the jury would have rendered a different verdict if the instruction using the "must not" language had been used.

## III. PROSECUTORIAL MISCONDUCT

Mitchell next argues that the prosecutor engaged in misconduct when he defined "reasonable doubt" as "common sense" in the closing argument.

We recently reviewed our standard of review for prosecutorial misconduct during closing argument in *State v. Pabst*, 268 Kan. 501, 504-05, 996 P.2d 321 (2000). In *Pabst*, we said:

"Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial. See *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 (1999). Some complained-of prosecutorial statements were not objected to at trial. If the claimed error has been determined to implicate a defendant's right to a fair trial, our standard of review is the same whether or not an objection was made at trial. If the claimed error rises to the level of a denial of the Fourteenth Amendment right to due process, the issue will be addressed. *State v. McCorkendale*, 267 Kan. 263, Syl. ¶ 6, 979 P.2d 1239 (1999).

. . . .

"The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. *State v. Lumley*, 266 Kan. 939, Syl. ¶ 12, 976 P.2d 486 (1999)."

Mitchell argues that the prosecutor defined "reasonable doubt" as "common sense," thereby lowering the burden of proof and prejudicially denying his right to a fair trial. During closing argument the prosecutor stated:

"The evidence in this case has proved beyond a reasonable doubt that this defendant, this man, killed Jeff and Randy Hobaugh during the early morning hours of April 16th, 1998 out on this drainage ditch area that you've seen over here in Planeview, Kansas.

. . . .

"Now we anticipate the defendant will get up here and argue that the State hasn't met its burden of proof, and they also will argue correctly that the defendant doesn't have to prove or disprove anything. They will surely point out that there's not an eye witness to this situation. They will surely point out that Mr. Paschal hasn't shown you the firearm or weapon that was used in this particular case, but, Ladies and Gentlemen of the Jury, we visited in jury selection about some matters that contained the law, the law of this case that we agreed we were going to follow, and *we know that the State's burden of proof in this type of criminal case and in any criminal case is a common sense burden, and what that means is that is a burden that is not requiring precision or exactness like a mathematical formula. This is not a burden that requires a necessity of close tolerances like the fitting of a machine part to function properly, and this is so because the system of justice deals with reality and it deals with all the imperfections that people—human beings bring into it. It's a common sense analysis. It's not one of precision. It's not*

*one of absolutes. It's a common sense situation, and what our common sense tells us, Ladies and Gentlemen of the Jury, is that at midnight on April 16th, gunfire did not erupt from the field over there in the drainage ditch and five shot bursts in a two-minute period and killed two people over in that drainage ditch.* What we know is Jeff and Randy Hobaugh burglarized this man's house. They stole his dope and stole his scales and we know—trying to find out who did it, we know he wasn't going to call the police about it, and we can infer from that and the location of these bodies, the trail of that blood—*we can make the common sense inference that this man killed those two individuals.*

. . . .

"Ladies and Gentlemen of the Jury, the evidence has been presented and it shows, beyond a reasonable doubt, this defendant thought the matter over beforehand, that's premeditation, and that he intentionally killed Jeff and Randy Hobaugh. That's what the evidence shows." (Emphasis added.)

In support of his argument, Mitchell cites *State v. Williams*, 659 S.W.2d 778 (Mo. 1983). In *Williams*, the defendant was convicted of one count of rape. On appeal before the Missouri Supreme Court, Williams argued that the prosecutor had prejudiced his right to a fair trial by lowering the burden of proof when he defined reasonable doubt as "common sense." The following remarks took place during closing argument in *Williams*:

" '[PROSECUTOR]: It is not beyond any doubt whatsoever. It is not beyond a shadow of a doubt. It is beyond reason and common sense. And, I told you that you don't have to leave your common sense outside when you walk into the jury room.

'Look at what the stories are. Look at who's telling the stories and look at the way they told the stories and then use your common sense and if your common sense tells you—

'[DEFENSE COUNSEL]: I will object, the instruction says to use a reasonable doubt [standard] and I will object to the characterization that we have been hearing.

'THE COURT: That objection will be overruled. Proceed.

'[PROSECUTOR]: If your common sense tells you that on the morning of July 14th there was sexual intercourse, it was without the consent of [the victim], and it was accomplished by force, instruction number five says that you will find the Defendant guilty. Look at that instruction and look at the evidence and come back with your verdict. That's all we ask.' " 659 S.W.2d at 781.

The Missouri Supreme Court reversed and remanded, holding that the prosecutor prejudiced Williams' right to a fair trial when

he improperly attempted to define reasonable doubt. The court stated:

"He attempted to define 'reasonable doubt,' stating his conception of it twice in the negative and then overtly characterizing the standard as 'beyond reason and common sense.' He then directed the jurors simply to use their common sense. After a timely objection, overruled by the court, counsel then proceeded to tell the jurors that if their common sense told them that intercourse occurred, it was nonconsensual and forcible, and that therefore they must find the defendant guilty.

"Because defense counsel's objection was overruled, the impermissible comments received the 'imprimatur of the trial court.' [Citation omitted.] In a case such as this where the evidence of guilt is sharply controverted and resolution of the conflict rests on a determination of which witness to believe, it is particularly true that [the error was not harmless]. The State's remarks conceivably improperly tipped the balance in favor of conviction." 659 S.W.2d at 782.

The State in this case correctly points out that it is not error for the prosecutor to mention common sense in the closing argument or to tell the jury that it can use common sense in reaching its decision. Indeed, Instruction No. 4 reads: "It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

The remarks by the prosecutor in this case defining "reasonable doubt" as "common sense" were improper. The court in *State v. Bridges*, 29 Kan. 138, 141 (1883), stated: " '[I]t has often been said by courts of the highest standing, that perhaps no definition or explanation can make any clearer what is meant by the phrase "reasonable doubt" than that which is imparted by the words themselves.' " (Quoting *State v. Kearley*, 26 Kan. 77, 87 [1881].)

The court in *State v. Davis*, 48 Kan. 1, 10-11, 28 Pac. 1092 (1892), also discussed what is meant by "reasonable doubt" and stated: "It is to be presumed that the jury understood what the words 'reasonable doubt' meant. The idea intended to be expressed by these words can scarcely be expressed so truly or so clearly by any other words in the English language."

The prosecutor in this case should not have attempted to alter the State's burden by telling the jury that "the State's burden of proof in this type of criminal case and in any criminal case is a

common sense burden." This remark is an erroneous statement of the law and is misleading. While the jury is free to use common sense to evaluate the evidence and the testimony, the burden of proof remains "reasonable doubt." By commenting that the State has a "common sense burden," the State impermissibly led the jury to believe that it could convict Mitchell by using a burden of proof less than "reasonable doubt."

Unlike the situation in *Williams*, however, the evidence of guilt in this case is not "sharply controverted" and the determination of guilt does not rest "on a determination of which witness to believe." Furthermore, the prosecutor's remarks did not receive the "imprimatur of the trial court," as the remarks were never objected to by Mitchell. The remarks in this case, although improper, did not "[tip] the balance in favor of conviction." 659 S.W.2d at 782.

We hold that although the prosecutor's remarks were improper, they were not so gross and flagrant as to prejudice the jury against Mitchell and deny him a fair trial. The error, when viewed in light of the record as a whole, had little, if any, likelihood of changing the result of the trial.

Affirmed.