No. 86,829

STATE OF KANSAS, *Appellee,* v. KENNETH A. KUNELLIS, *Appellant.*

(78 P.3d 776)

Opinion filed October 31, 2003.

*Paige A. Nichols*, special appellate defender, of Topeka, argued the cause, and *Randall L. Hodgkinson*, deputy appellate defender, was with her on the briefs for appellant.

*Richard G. Guinn,* assistant district attorney, argued the cause, and *Steven J. Obermeier,* assistant district attorney, *Paul J. Morrison,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.; In December 1999, the State charged 15-year-old Kenneth Kunellis with burglary, theft, and two counts of felony murder for his involvement in activities arising out of a break-in of an Olathe motorcycle dealership. At the same time, the district court granted the State permission to prosecute Kunellis as an adult.

Following a 4-day trial, a jury convicted Kunellis of all charges. The court sentenced him to 2 terms of life in prison, along with 12 months for the burglary and 6 months for the theft, all terms concurrent with each other. This is his direct appeal seeking reversal of his felony-murder and theft convictions or, in the alternative, resentencing under the Juvenile Justice Code. See K.S.A. 38-1663. Our jurisdiction is under K.S.A. 22-3601(b)(1), a maximum sentence of life imprisonment imposed.

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the district court violate the principles of *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *State v. Gould,* 271 Kan. 394, 23 P.3d 801 (2001), by approving the State's motion to try Kunellis as an adult? No.
2. Was the district court's decision to try Kunellis as an adult supported by substantial evidence? Yes.
3. Were the district court's jury instructions and the State's closing remarks accurate statements of the law regarding theft and the accompanying felony murders? No.
4. Was the evidence sufficient to support convictions for theft and felony murder? Yes.
5. Did prosecutorial misconduct and district court error violate Kunellis' right to due process and a fair trial? Yes.
6. Did the district court abuse its discretion in admitting evidence that Kunellis was flippant and taunting one of the victims? No.
7. Did the district court abuse its discretion in admitting certain photographic and audiovisual evidence? No.
8. Did the district court err in failing to provide a jury instruction on "extraordinary intervening event"? No.

Accordingly, we reverse Kunellis' convictions for theft and felony murder and remand for a new trial.

FACTS

On the evening of December 11, 1999, Kenneth Kunellis, age 15, was with his brother Kris and their friends Ben and Aaron Rogers. After deciding to break into a Suzuki motorcycle dealership in Olathe, they got into Ben's passenger van and began search-

ing for a vehicle suitable to carry stolen motorcycles. They quickly found a truck with a 14-foot enclosed cargo box at a used car dealership along I-435 at Front Street in Kansas City, Missouri. After Ben hot-wired the truck, Aaron drove Ben's van and led the group to the Olathe dealership.

When they arrived, Ben drove the stolen truck to the side of the dealership, parked, and began searching for the telephone lines that Aaron had told him would disable the business' alarm system when cut. While Ben cut the phone lines, the Kunellis brothers remained in the stolen truck, and Aaron served as a lookout in Ben's van.

After Ben completed his task at the rear of the building, he returned to the truck, pulled back onto the street and backed up through the parking lot to a display window. He then walked to the back of the truck and picked up the sledge hammer. When the Kunellis brothers lifted the truck's rear sliding door, Ben smashed the display window.

The plan was to load up as many motorcycles as possible in a certain period of time, but Ben's delay in locating and cutting the phone lines limited the time available. Additionally, they had unforeseen difficulties loading the heavy motorcycles. After loading only three, Ben told the others it was time to go. As Ben drove the truck, the Kunellis brothers remained in the cargo area managing the motorcycles and holding the sliding rear door closed.

Shortly before the group left, Reuben Feuerborn had driven into the parking lot and noticed a cargo truck backed up to a building. After the truck left, Feuerborn's wife noticed the front window of the dealership had been smashed, so Feuerborn called 911. Feuerborn informed the police of the truck's description, location, and direction of travel, and began to drive in the same direction of the departed truck.

Olathe police dispatch records indicate the Feuerborns first reported the crime at 10:58 p.m. Two minutes later, after the Feuerborns regained sight of the truck, they informed the police it was about to enter northbound I-35. At 11:04 p.m., Officer Allen called for assistance and reported he was following the truck northbound at 119th and I-35. Once Allen was joined by Lenexa Police Officer

Trevino at 11:07 p.m., he activated his emergency lights and attempted to stop the truck.

Ben testified he was unaware of any pursuers until Officer Allen activated his lights at about 97th Street. Ben then exited northbound I-35 at 87th Street and entered southbound 69 Highway, traveling against traffic to discourage pursuers. The truck then collided with a Toyota Camry occupied by Rick Sloan and his fiance Simone Sanders. Sanders was killed instantly, and Sloan received injuries which would prove fatal hours later.

## ANALYSIS

Issue 1. *Did the district court violate the principles of Apprendi v. New Jersey and State v. Gould by approving the State's motion to try Kunellis as an adult?*

Kunellis argues that as a result of the district court's approval of the State's motion to waive juvenile court jurisdiction, the court subjected him to increased potential penalties without a jury's determination of necessary facts. This purported violation of the principles as enunciated in *Apprendi v. New Jersey* and *State v. Gould* raises constitutional issues, and our review is therefore unlimited. See *Mudd v. Neosho Memorial Regional Med. Center*, 275 Kan. 187, 197, 62 P.3d 236 (2003). We observe, however, that Kunellis failed to raise this issue until now. While we might overlook this failure to preserve the issue in order to prevent a denial of his fundamental rights pursuant to *State v. Coleman*, 271 Kan. 733, 735, 26 P.3d 613 (2001), we observe that we resolved this identical *Apprendi* argument against another defendant in *State v. Jones*, 273 Kan. 756, Syl. ¶ 5, 47 P.3d 783, *cert. denied* 537 U.S. 980 (2002). Kunellis' argument therefore has no merit.

Issue 2. *Was the district court's decision to try Kunellis as an adult supported by substantial evidence?*

Kunellis next argues the district court erred in granting the State's motion to try him as an adult. Our standard of review of this issue is whether the decision is supported by substantial evidence. *State v. Medrano*, 271 Kan. 504, 506, 23 P.3d 836 (2001). Substantial evidence is evidence which possesses both relevance

and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. 271 Kan. at 507. Under this standard, we do not reweigh the evidence, substitute our evaluation of the evidence for that of the trial court, or pass upon the credibility of the witnesses. 271 Kan. at 507.

K.S.A. 38-1636(e) requires the district court to consider eight different factors when determining whether prosecution of a juvenile as an adult should be authorized. Here, the court received testimony at the waiver hearings from Charlene Whitney, a court services officer with over 20 years' experience, who addressed all eight statutory factors based upon her investigation. She opined that while the planned crimes were theft and burglary, Kunellis risked the possibility of injuring or killing others when he committed these inherently dangerous felonies. Though he had no prior history of criminal adjudications, Kunellis had a history of fighting or disruptive behavior in school settings and at the juvenile detention facility, which indicated to her that he would be difficult to place and treat as a juvenile offender.

Whitney also testified Kunellis considered himself a leader, had experimented with marijuana, and had associated with others who were involved in criminal acts. Since he had received counseling, lived in a group home, and received other medical treatments, he had received the full range of services available in the past. Whitney also opined that the court would have decreased control over Kunellis if it allowed out-of-state placement. She believed the treatment facilities within the State were not adequate to complete his treatment within the maximum period permitted under the Juvenile Justice Code.

In addition to Whitney's testimony, the State presented related testimony from five police officers involved in the criminal investigation, as well as testimony from several other witnesses addressing the severity and nature of the crimes charged.

Given our deferential standard of review, and given that Kunellis had the burden under K.S.A. 38-1636(a)(2) of proving he was amenable to treatment under the Juvenile Justice Code, we hold the district court's decision to try him as an adult was adequately supported by the evidence.

Issue 3. *Were the district court's jury instructions and the State's closing remarks accurate statements of the law regarding theft and the accompanying felony murders?*

Kunellis next argues that the jury instructions, together with the prosecutor's closing arguments that interpreted those instructions, presented the jury with an inaccurate statement of the law of theft, the crime underlying his convictions for felony murder. Consequently, these errors resulted in his wrongful convictions of those two crimes. He objected to the instructions but not to the prosecutor's statements.

When we review challenges to jury instructions,

"[w]e are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citation omitted.]" *State v. Mitchell,* 269 Kan. 349, 355, 7 P.3d 1135 (2000).

When we review alleged prosecutorial error which had not been objected to at trial, we determine whether the error was harmless or rises to the level of violating a defendant's constitutional right to a fair trial and, thus, deny a defendant his or her Fourteenth Amendment right to due process. *State v. Scott,* 271 Kan. 103, 113, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001); see *State v. Holmes,* 272 Kan. 491, 498, 33 P.3d 856 (2001).

We begin our analysis by examining the statutory definitions of felony murder and theft. K.S.A. 21-3401(b) defines felony murder as: "the killing of a human being committed . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436." In turn, K.S.A. 21-3436(a)(8) includes felony theft under subsection (a) or (c) of K.S.A. 21-3701 as an inherently dangerous felony. In 1995, the legislature renumbered 21-3701, without correspondingly modifying 21-3436, so that felony theft is now described as follows:

"(a) Theft is any of the following acts done with intent to deprive the owner permanently of the possession, use or benefit of the owner's property:
(1) Obtaining or exerting unauthorized control over property;
. . . .

(3) obtaining by threat control over property."

While Kunellis admits that the crime of theft is an inherently dangerous felony, he argues the theft is complete when a person takes unauthorized possession of the property of another. As a result, a conviction for felony murder based upon a death occurring after the "commission" of the theft, without more, cannot stand. See K.S.A. 21-3401(b). According to Kunellis, conviction for a felony murder following that theft can only be based upon "flight from" that completed crime. K.S.A. 21-3401(b). The State, on the other hand, essentially argues that the crime of theft is a continuing offense, *i.e.*, the theft continues until the perpetrator separates himself or herself from the stolen property. In support, it cites the following language in the theft statute: "obtaining *or exerting* unauthorized control over property." (Emphasis added.)

We agree with Kunellis. This court has previously rejected the State's interpretation in *State v. Gainer*, 227 Kan. 670, 672-74, 608 P.2d 968 (1980), where we examined when the crime of theft terminates:

" 'Theft is any of the following acts done with intent to deprive the owner permanently of the possession, use or benefit of his property:

" '(*a*) Obtaining or exerting unauthorized control over property;'

"The State's position is that the statutory prohibition against '[o]btaining or exerting unauthorized control over property' includes within its proscription the continued unauthorized possession of the property after the initial theft. The State cites no authority to support this rather inventive theory.

"The State contends a legislative intent appears to make the exertion of unauthorized control over the property a continuing offense. It insists that the use of the words '[o]btaining or exerting unauthorized control' in the statute establishes that intent. . . .

"We do not agree that a continuing offense was intended by the legislature when it defined the crime of theft. The use of the words '[o]btains or exerts control' was for the purpose of consolidating what were formerly the crimes of larceny and embezzlement into a single crime of theft. See the Judicial Council note following K.S.A. 21-3701.

"That section of our criminal code was drafted after examining the Illinois Criminal Code, 16-1 and the Model Penal Code, 223.1 as indicated in the Judicial Council note following the statute. In *People v. Steinmann*, 57 Ill. App. 3d 887, 373 N.E.2d 757 (1978), the Illinois court held that its theft statute did not make 'exerting unauthorized control over the property' a continuing offense.

"After considering the above authorities we hold the crime of theft by obtaining or exerting unauthorized control over property with intent to deprive the owner permanently of the possession, use or benefit of his property as proscribed in K.S.A. 21-3701(a) is not a continuing offense." (Emphasis added.)

In *Gainer*, the court held that the theft had been completed when the property — several handguns — had been removed from the victim's attic. The State was therefore prohibited from prosecuting the theft more than 2 years later. 227 Kan. at 674-75. We restated this rule in *State v. Palmer*, 248 Kan. 681, 690, 810 P.2d 734 (1991), where we held:

"All criminal offenses, except those considered continuing offenses, are committed when every act which is an element of the offense has occurred. Continuing offenses are committed when the course of the prohibited conduct, or the accused's complicity in the crime, has terminated. To constitute a continuing offense, it must plainly appear in the statute defining such offense that there is clear legislative intent to make the prohibited conduct a continuing offense. The crime of theft as proscribed in K.S.A. 21-3701(a) is not a continuing offense. [Citation omitted.]"

Both decisions basically restated prior law. In *State v. Knowles*, 209 Kan. 676, 678, 498 P.2d 40 (1972), we had held that " '[t]heft' under the present statute, unlike 'larceny' under the old, requires no asportation to complete the crime. All that is required is the (here unauthorized) control, coupled with the intent to deprive the owner permanently of his possession, etc."

We strove to eliminate any confusion on the crime completion issue as recently as 5 years ago in *State v. Bateson*, 266 Kan. 238, 970 P.2d 1000 (1998), where we discussed the related crimes of robbery and theft. " 'Commission of the crime of robbery is complete when the robber takes possession of the property, as the element of asportation is no longer required to complete the crimes of *theft* or robbery.' " (Emphasis added.) 266 Kan. at 243 (quoting *State v. Long*, 234 Kan. 580, 585, 675 P.2d 832 [1984]). In short, the "theft by exertion" option applies to crimes such as embezzlement, not the physical theft at issue here. See Wilson, *Thou Shalt Not Steal: Ruminations On The New Kansas Theft Law*, 20 Kan. L. Rev. 385, 406 (1972) ("Obtaining" unauthorized control is the touchstone for theft by a stranger, while "exertion" of unauthorized

control is sufficient proof in the embezzlement situation where the actor already has control.).

While the theft of the motorcycles was completed well before the two tragic deaths in the case at hand, the jury instructions and verdict forms themselves unfortunately set the stage for the jury eventually finding that the crime of theft was an "ongoing offense." Jury instruction No. 16 began the problem when it allowed the jury the option of selecting "exerted unauthorized control over the property" as one of two bases for the theft. It stated:

"As to count 4, the defendant is charged with the crime of theft of property of value of at least $500 but less than $25,000. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved:

"1. That Olathe Suzuki was the owner of the property;

"2. That the defendant:

 a. *obtained* unauthorized control over the property;

 **OR**

 b. *exerted* unauthorized control over the property." (Emphasis added.)

The jury verdict form for theft (count 4) repeated the problem begun in the theft instruction:

"We, the jury, find the defendant guilty of theft of property of a value of $500 but less than $25,000; the defendant having *obtained* unauthorized control over the property.

[or]

"We, the jury, find the defendant guilty of theft of property of a value of $500 but less than $25,000; the defendant having *exerted* unauthorized control over the property." (Emphasis added.)

The problem is repeated in the jury verdict forms for counts 1 and 2 (the felony murders of Sloane and Sanders, respectively), which contained similar language:

"We, the jury, find the defendant guilty of murder in the first degree, the killing having been done in the commission of or flight from theft of a value over $500, to wit: three suzuki motorcycles; the defendant having *obtained* unauthorized control over the property.

[or]

"We, the jury, find the defendant guilty of murder in the first degree, the killing having been done in the commission of or flight from theft of a value over $500, to wit: three suzuki motorcycles; the defendant having *exerted* unauthorized control over the property." (Emphasis added.)

These problems were exacerbated by the State's interpretation of the instructions in closing arguments. Without objection, the State essentially informed the jury that theft was a continuing offense, and Kunellis' unbroken "exertion of control" over the motorcycles from the time of theft until the time of the accident was a single continuing offense, not flight from an accomplished theft. The State explained the jurors' options for finding Kunellis guilty of felony murder in the following language:

"The fourth option is the killing occurs during the commission of a theft where there is exerting of unauthorized control over those motorcycles. Isn't the evidence pretty much the same as it relates to all of these? There's a very important distinction regarding the two options there concerning theft. The burglary, as we know, is when they enter into the business for the purpose of committing a theft therein. The theft, one of the two options of obtaining property, as well occurs there at the business where they obtained the motorcycles without permission or authority, and the value being in excess of $500. *The third option is the exerting unauthorized control over those motorcycles. This exerting option is one that allows for you, as jurors, to conclude that they were exerting unauthorized control of those motorcycles from the very point in time that they are leaving that motorcycle dealership all the way through that neighborhood in Olathe where they got lost, all the way up Santa Fe streets where they drove that cargo van and all the way down Interstate 35, all the way down to where the police begin to turn sirens on and all the way through the rest of the pursuit and the driving of the cargo van against the flow of traffic on 69 Highway.*

"*The exerting is taking place that entire time frame. Why is that important? It's important because you, as the jury, are to conclude that a felony murder took place in both Counts 1 and 2, both Rick Sloan and Simone Sanders, if that felony of theft, that exerting unauthorized control exists, and we contend it does, and if the killing took place during the commission of or flight from that felony. That's exerting unauthorized control. You're given an instruction that relates to certain factors that you can look to in deciding whether or not that killing occurred during the commission of the underlying felony.*

"*The three factors you're going to look to are time, distance and causal connection. That's Instruction No. 14. Let's look at the time as the killing relates to this theft by unauthorized control. Let's look at the timing of that theft. At the very moment that that killing takes place, or that collision takes place, they, both Ben Rogers and Ken Kunellis, are exerting unauthorized control over those motorcycles simultaneous in terms of the timing of those two. It's occurring during the commission of that felony, the commission of that theft. Distance, what's the distance in terms of that fact or the distance? There is no distance. They are exerting unauthorized control over those motorcycles when that collision takes place. There*

*is no distance there to consider in terms of from Olathe to Lenexa, because they're exercising unauthorized control over those motorcycles."* (Emphasis added.)

On rebuttal, the State continued its refrain. It argued that by the jury selecting the "exerting" option it need not even consider flight from the felony as a basis for murder:

*"There's no issues concerning flight. We again contend that the exerting option doesn't even require that you look at [flight].* The exerting option basically says that they're in the commission of that crime when the commission takes place, and we would contend *that's the version that is the strongest evidence in support of guilt. The other two options are flight options."* (Emphasis added.)

The jury found Kunellis guilty of theft by marking the verdict form's box for *exerting* unauthorized control over the property, *i.e.,* which applies to embezzlement-type crimes, and not the box for *obtaining* unauthorized control, which applies to physical theft. Similarly, the jury found Kunellis guilty of felony murder for the deaths of both Sloane and Sanders by marking the verdict forms' boxes for theft by *exerting* unauthorized control and not the boxes for *obtaining* unauthorized control. While the jury verdict forms for both counts of felony murder did inform the jury of the requirement for the "killing having been done in the commission *or* flight from" either theft or burglary as the possible bases for conviction — and arguably a jury could therefore have determined guilt by flight from a completed theft — the jury's other completed verdict forms confirm its decisions were based upon the erroneous theft-based instructions. In particular, the jury found Kunellis guilty of burglary, also an inherently dangerous crime and therefore a basis for felony murder. See K.S.A. 21-3436(a)(9). Yet its completed verdict forms rejected the commission of burglary, and more importantly the flight from a burglary, as the basis for his conviction of felony murder.

We are compelled to conclude that in the jury's mind, the crime of burglary was complete well before the deaths and Kunellis was not in flight from it at the time of the deaths; hence, that crime provided no basis for felony murder. We must also conclude, however, that in the jury's mind the crime of theft (by exertion of unauthorized control) was ongoing. It was still being committed at

the time of the deaths, hence providing the only basis for felony murder. As a matter of law, the theft — like the burglary — was also completed before the deaths. See *Gainer*, 227 Kan. 670. In short, the completed verdict forms reveal that the jury indeed relied on the improperly defined theft-by-exertion theory to convict Kunellis of both theft and felony murder.

Consequently, we hold that the jury instructions and verdict forms were erroneous and constitute reversible error. They did not properly and fairly state the law as applied to the facts of the case, and the jury was misled by them. See *State v. Mitchell*, 269 Kan. 349, 355, 361, 7 P.3d 1135 (2000). Moreover, under the circumstances of the case at hand, the jury's receipt of an alternative charge that was legally sufficient — "theft by obtaining" — cannot salvage the convictions for the State. As the United States Supreme Court has stated:

"Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law — whether, for example the conviction in question . . . fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." *Griffin v. United States*, 502 U.S. 46, 59, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991).

See also *Keating v. Hood*, 191 F.3d 1053 (9th Cir. 1999), *cert. denied* 531 U.S. 824 (2000) (granting habeas relief to Charles Keating and reversing state securities fraud convictions where instructions on one of two alternate means of conviction omitted essential mens rea element and conviction thus violated due process).

We also hold that the prosecutor's comments interpreting the jury instructions were themselves incorrect statements of the law. We do not need to determine whether the prosecutor's misstatements were intentional as in *State v. Holmes*, 272 Kan. 491, 499-500, 33 P.3d 856 (2001), but only to recognize that the completed verdict forms reveal that the jury clearly accepted his invitation by rendering faulty verdicts for both theft and felony murder as detailed earlier in this opinion. Accordingly, we can conclude that the result of the unobjected-to misstatements was to deny Kunellis his right to a fair trial and, thus, his Fourteenth Amendment right to

due process. See *State v. Scott*, 271 Kan. 103, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001); *State v. Lumley*, 266 Kan. 939, 965, 976 P.2d 486 (1999).

The case is reversed and remanded for retrial on the felony murder and theft charges. The jury should be instructed on the "obtaining unauthorized control" definition of theft, and should receive no instruction on "exerting unauthorized control" as an option. We note that at Kunellis' trial he had freely admitted the elements comprising the crime of theft while denying the two deaths resulted from his commission of, or flight from, that crime. The need for actual retrial on the theft charge may therefore practically have been eliminated. In any event, the jury should also be clearly instructed on the flight element of felony murder pursuant to K.S.A.21-3401(b), so it may determine if the deaths occurred during the flight from the underlying felony.

Issue 4: *Was the evidence sufficient to support convictions for theft and felony murder?*

Kunellis next argues the evidence was insufficient to support his convictions for theft and the accompanying felony murders and the district court was wrong to deny his motions for judgment of acquittal on the latter. As a result, he argues reversal — without remand because of faulty jury instructions — is required. We disagree. Our standard of review is well known:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Johnson*, 266 Kan. 322, Syl. ¶ 1, 970 P.2d 990 (1998).

As stated earlier, Kunellis essentially admitted committing the elements comprising the crime of theft through obtaining unauthorized control. See K.S.A. 21-3701. His argument regarding theft therefore has no merit.

Regarding the felony murders, Kunellis argues that the inherently dangerous felony crime of theft had been completed well before the deaths occurred. As a result, he contends the killings were not committed in the commission of the crime and the felony

murders cannot be supported on that basis. See K.S.A. 21-3401(b) (felony murder is the killing of a human being committed in the commission of, attempt to commit, or flight from an inherently dangerous felony). As stated previously, we agree. He further argues that the evidence was insufficient to establish he was in flight from the theft at the time the killings occurred and that the felony murders cannot be supported on that basis either. We disagree. See K.S.A. 21-3401(b).

We have stated that time, distance, and the causal relationship between the underlying felony and a killing are factors to be considered in determining whether the killing occurs during the commission of or flight from the underlying felony and, therefore, subject to the felony-murder rule. *State v. Sophophone*, 270 Kan. 703, 711, 19 P.3d 70 (2001); *State v. Kaesontae*, 260 Kan. 386, 390, 920 P.2d 959 (1996). The question of whether the flight had terminated prior to the killing so as to remove it from the ambit of the felony-murder rule is, like the question of whether the underlying felony had been abandoned or completed, ordinarily one of fact for the jury.

The evidence, when viewed in the light most favorable to the State, was as follows: The Feuerborns arrived at the dealership while the stolen truck containing the recently stolen motorcycles was still there. The truck quickly left, by inference in reaction to the Feuerborns' arrival. Shortly afterward, Feuerborn's wife noticed the dealership's front window had been smashed so Feuerborn immediately called 911. He informed the police at 10:58 p.m. of the truck's description, location, and direction of travel and began to drive in the same direction of the departed truck in an apparent effort to track it. At 11 p.m. the Feuerborns regained sight of the truck and informed the police it was about to enter northbound I-35. At 11:04 p.m., Officer Allen called for assistance and reported he was following the truck northbound at 119th and I-35. Once Allen was joined in the pursuit by Lenexa Police Officer Trevino at 11:07 p.m., he activated his emergency lights at about 97th Street and attempted to stop the truck. In reaction to the officer's lights, Ben exited northbound I-35 at 87th Street and entered southbound 69 Highway. He deliberately traveled against

traffic for the purpose of discouraging his law enforcement pursuers. The truck then collided with the Toyota Camry. Officer Allen called in the accident at 11:11 p.m., 13 minutes after the Feuerborns had first called 911 to report the apparent break-in.

Based upon this view of the facts, we are convinced that a rational factfinder could have found Kunellis guilty of felony murder beyond a reasonable doubt, *i.e.*, that the deaths occurred during the flight from the theft.

Kunellis claims the State committed further misconduct and the trial court additional error. These claims could now be disregarded because of our reversal and remand on previously noted grounds. We address them below, however, to supply guidance because they could arise in a retrial. See *State v. Carter*, 270 Kan. 426, 441, 14 P.3d 1138 (2000).

## Issue 5. *Did prosecutorial misconduct and district court error violate Kunellis' rights to due process and a fair trial?*

Kunellis claims the State committed misconduct and the district court committed error in allowing the jury to consider several items of evidence and several State's comments during opening statement and closing argument. More particularly, he alleges these were designed to evoke sympathy for the victims and combined to violate his rights to due process and a fair trial. Kunellis argues that whether under our standards of review for prosecutorial misconduct or erroneous admission of evidence, the error was reversible. See generally *State v. Holmes*, 272 Kan. 491 (if prosecutor's statements rise to level of violating defendant's right to fair trial and deny defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite lack of contemporaneous objection); *State v. Yardley*, 267 Kan. 37, 40, 978 P.2d 886 (1999) (error based upon exclusion of evidence reviewed for abuse of discretion). We will examine each allegation of error.

Kunellis first challenges the testimony of a forensic pathologist, Dr. Michael Handler, concerning Sloan's and Sanders' injuries. He claims the details elicited concerning the autopsy procedure and the victims' injuries were irrelevant, gruesome, and prejudicial to his case. He specifically claims comments by the doctor that there

was blood coming from both of Sanders' ears, that she suffered a fractured skull, and that the injury was confirmed when they removed her brain were improper. Kunellis finds Handler's description of Sloan's injuries particularly objectionable. In describing the effects of Sloan's broken pelvis, Handler indicated Sloan's penis and scrotum were discolored and swollen. He also indicated Sloan was uncomfortable due to his extensive injuries and that he probably knew he was dying slowly.

We disagree with Kunellis. A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal. *State v. Jamison,* 269 Kan. 564, 569-70, 7 P.3d 1204 (2000). Kunellis failed to object. Furthermore, even if Kunellis had objected, the admission of evidence lies within the sound discretion of the trial court. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the court abused its discretion bears the burden of showing such abuse of discretion. *Lumley,* 266 Kan. at 950. As the State had the burden of proving the fact and cause of Sloan's and Sanders' deaths, we hold there was no abuse of discretion by the court in admitting Handler's testimony. Included in our holding is a rejection of Kunellis' suggestion that this testimony was designed to evoke sympathy for the victims.

Of greater concern is the testimony of Allen Epstein, and its foreshadowing by the State's comments in opening statement. Kunellis primarily cites *State v. Donesay,* 265 Kan. 60, 82-89, 959 P.2d 862 (1998), and *Carter,* 270 Kan. at 442, in support of his argument. Whether analyzed as prosecutorial misconduct or as erroneous admission of prejudicial evidence, we hold error was committed and should not be repeated upon retrial, as discussed below.

Kunellis claims that the State's opening statement, though unchallenged at trial, presented a "Norman Rockwellesque" picture of the victims' lives just prior to the accident:

"Driving in that white Toyota Camry were 30-year-old Rick Sloan and 30-year-old Simoane [*sic*] Sanders. You'll hear they're both from the Springfield area, that they planned to be married this summer, that they — Rick had taken a position

in Denver, Colorado, and flown in to the Kansas City International Airport, that Simaone [*sic*] had picked him up at the airport, that they spent the night at a restaurant and at the Christmas lights on the Plaza and were heading southbound into Overland Park to spend the evening in a hotel in Johnson County."

The State's evidence supporting these comments was elicited from its first witness, Epstein, who had been Rick Sloan's best friend. Epstein stated he had been asked by the families of Sloan and Sanders to testify, and he was to have been the best man at the couple's approaching summer wedding. Further, he gave a brief description of their careers and explained what the couple was doing in Kansas City on the evening of the accident prior to their deaths. Epstein went on to identify a photo of the couple. He testified without objection.

In *Donesay*, as cited by Kunellis, this court reversed a conviction for premeditated first-degree murder and a hard 40 sentence. We stated we had no choice but to reverse because the State's insistence in presenting the victim's widow's testimony to the jury affected the substantial rights of the defendant to a fair trial. 265 Kan. at 89. Commenting on the materiality of the widow's testimony, this court observed:

"The purpose of the State's eliciting Mrs. Easter's testimony was not to identify the defendant as the killer, was not to show that he intended to kill Officer Easter, and was not to show premeditation. Her testimony was not intended to show the guilt of the defendant, and it did not. We can only conclude that it was intended to infuriate and inflame the jury against the defendant." 265 Kan. at 89.

In *Carter*, also as cited by Kunellis, we found that though a father's statement was much briefer and less inflammatory than the widow's in *Donesay*, it was still "immaterial and served only to inflame the jury." 270 Kan. at 442. We reinforced our holding in *Donesay* by quoting that decision:

" 'The admission of evidence in a murder trial regarding the victim's family, the victim's relationship with a spouse or family members and friends, the victim's character, and the details of the victim's last days before death which has been intentionally and not accidentally elicited by the prosecuting attorney during trial, is patently improper and reversible error.' 265 Kan. 60, Syl. ¶ 9." 270 Kan. at 442.

Epstein's testimony fits into this category. Since we are reversing and remanding on other grounds, and since we hold Epstein's tes-

timony — and related prosecutorial comments — were error that should not be repeated on retrial, we need not review in detail the "harmless error" cases cited by the State. See *State v. Galloway*, 268 Kan. 682, 689-90, 1 P.3d 844 (2000); *State v. Caenan*, 270 Kan. 776, 789, 19 P.3d 142 (2001).

We will observe, however, that the error was too substantial to be cured by providing the jury with instruction No. 5: "You must consider this case without favoritism or sympathy for or against either party. Neither sympathy nor prejudice should influence you." We also reject the State's argument that the evidence was admissible to "demonstrate Sloan and Sanders were in a serious committed relationship and were not driving to a hotel for a one-night stand." The State may not present evidence of a victim's good character unless and until it has been attacked by the defense. *State v. Mader*, 261 Kan. 280, Syl. ¶ 1, 931 P.2d 1247 (1997). Epstein was the State's first witness in its case in chief.

On the same theme, Kunellis complains about the State's comments during rebuttal closing argument which he claims again drew improper attention to the victims' deaths:

"[Prosecutor]: I would ask that you also remember that there were two people that you didn't hear from in this case and that's because they're no longer alive, and when you —

"[Kunellis' counsel]: Objection, your Honor.

"THE COURT: Excuse me. State your objection.

"[Kunellis' counsel]: Once again, the State is referring to sympathy which has been dealt with by the Court and instructions.

"THE COURT: It does appear to be a sympathy argument, Mr. Guinn.

"[Prosecutor]: I'd ask you to remember that those individuals have the right to have their case presented in court. And, yeah, it's tough to look at these pictures, but the State who would contend that these pictures are part of this case and [to] short circuit . . . or present to you as jurors of this case half the evidence isn't fair to those families. The State believes that it was a fair presentation of the evidence. Mr. Johnson certainly knows that there were numerous autopsy photographs that we didn't even try to get in because we understood that this case is to be on [the] facts.

"Mr. Johnson [Rogers' counsel]: Judge, I would object to his comments about things not in evidence.

"THE COURT: Sustained."

The State argues these prosecutor's comments do not violate the two-part test for prosecutorial misconduct articulated in *State v.*

*Finley,* 268 Kan. 557, 571-72, 998 P.2d 95 (2000): (1) Were the remarks outside the considerable latitude the prosecutor is allowed in discussing the evidence, and (2) were the remarks so gross and flagrant as to prejudice the jury against the defendant and to deny the defendant a fair trial? More particularly, it contends the comments were merely in response to Kunellis' attempt to evoke sympathy based on his age and codefendant Rogers' attempt to place the jury in his shoes. Consequently, any error should be considered without prejudice when the questionable statements of a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel. See *State v. McKinney,* 272 Kan. 331, 347-48, 33 P.3d 234 (2002). We disagree with the State's characterization. Most importantly, the prosecutor's comments had a negative impact on Kunellis' right to a fair trial and, therefore, should not be repeated at retrial. See *State v. McCorkendale,* 267 Kan. 263, 286, 979 P.2d 1239 (1999) (remarks about victim not being there to tell jurors what happened may be designed to elicit sympathy for victim and thus be improper).

In summary, during the retrial the testimony of Epstein — with related prosecutorial comment — should not be allowed. Nor should prosecutorial comment be made regarding the inability of the two decedents to testify.

Issue 6: *Did the district court abuse its discretion in admitting evidence that Kunellis was flippant and taunting one of the victims?*

Kunellis next claims that the testimony of several emergency medical technicians (EMTs), as foreshadowed by the State's comments in opening statement, was irrelevant and prejudicial. In the prosecutor's opening statement he commented, without objection, that while the mortally injured Sloan attempted to sit up in the ambulance, "Ken Kunellis engaged in what [the EMTs] perceived as demeaning sarcastic responses toward Rick Sloan to the point where they eventually had to tell Ken Kunellis on that trip to keep his mouth shut." When the State later questioned Lori Volker, the vehicle driver and EMT responsible for Kunellis, she characterized his responses to her triage questioning as "very quick" and "flippant." Defense counsel again failed to object. When the State later

questioned her as to whether she could hear Kunellis' comments to Mr. Boswell, the other EMT in the vehicle while she drove, defense counsel objected. Over his objection, she testified she heard Boswell say, "Listen, I told you to be quiet." Following Volker's testimony, Boswell testified, without objection, that he thought Kunellis was acting in a taunting manner towards Sloan.

We disagree with Kunellis' position. We first observe he did not preserve this issue for appeal by timely and repeated objection. *Jamison*, 269 Kan. at 569-70. Even if Kunellis had objected, he himself admits the standard of review is abuse of discretion. *Lumley*, 266 Kan. at 950. He shows no such abuse. The trial court stated the testimony was relevant because it "does tend to show that this was apparently not an all together unexpected event." Additionally, the testimony was relevant to show Kunellis' state of mind at the time of the accident and infers he was a willing participant in all the evening's activities which eventually resulted in Sloan's and Sanders' deaths. The court did not err in admitting such testimony.

Issue 7: *Did the district court abuse its discretion in admitting photographic and audiovisual evidence?*

Kunellis next claims the trial court erred in allowing the State, over timely objection, to enter four photographs of the aftermath of the accident scene and a videotape taken by a police officer depicting the accident moments after it occurred. He argues the photographs and videotape were unduly prejudicial and needlessly gruesome.

The trial court has broad discretion regarding the admission of demonstrative photographs. *State v. Roberts*, 261 Kan. 320, 329, 931 P.2d 683 (1997). Even where the defendant concedes the cause of death, the prosecution has the burden to prove all the elements of the crime charged; photographs and videotape may be used to prove the elements of the crime, including the fact and manner of death. *State v. Smallwood*, 264 Kan. 69, 84, 955 P.2d 1209 (1998). See *State v. Spears*, 246 Kan. 283, 286, 788 P.2d 261 (1990).

The photographs reveal that a violent automobile accident occurred as a result of the conduct of Kunellis' group. It is also well

settled that photographs which serve to illustrate the nature or extent of the injuries are admissible when they corroborate the testimony of witnesses. *Spears*, 246 Kan. at 286. In this case, several police officers, a forensic pathologist, and the defendants all testified as to aspects of the accident scene, and the photographs corroborated elements of their testimony. We have reviewed the photographs in the record, and none were gruesome or needlessly repetitious. The trial court did not abuse its discretion in allowing the admission of the photographs into evidence.

The videotape was taken by Officer Trevino's dash-mounted video camera as he pursued the fleeing truck. At the scene of the accident, he stopped his vehicle directly behind the truck. We have viewed the videotape, and it reveals the stolen motorcycles in the back of the truck, as well as Kris Kunellis and Rogers being removed from the truck. The positioning of Trevino's vehicle behind the truck prevented the viewer of the videotape from observing the damaged passenger compartment of Sloan's and Sanders' automobile. The videotape was relevant to show that a violent automobile accident occurred as a result of the conduct of Kunellis' group and confirmed aspects of the testimony of several key witnesses to the accident scene. The videotape was not gruesome. The trial court did not abuse its discretion in allowing the admission of the videotape into evidence.

Issue 8: *Did the district court err in failing to provide a jury instruction on "extraordinary intervening event"?*

Kunellis claims the district court erred in refusing to give the jury an "extraordinary intervening event" instruction which he had requested. Specifically, he argues that Rogers' decision to drive the stolen truck against traffic and Sloan's blood alcohol concentration of .06% amounted to extraordinary intervening events absolving him of guilt because he had no control over their conduct. He notes the district court's obligation as stated in *State v. Gholston*, 272 Kan. 601, 615, 35 P.3d 868 (2001), *cert. denied* 536 U.S. 963 (2002):

"In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When consid-

ering the refusal of the trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. [Citation omitted.]"

This standard cannot be reviewed in isolation, however. As noted, our standard of review is stated in *State v. Mitchell*, 269 Kan. 349, 355, 7 P.3d 1135 (2000):

"When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citation omitted.]"

The district court instructed the jury in instruction No. 14 that "[t]ime, distance, *and the causal relationship* between the underlying felony and the killing are factors to be considered in determining whether the killing was done in the commission of or in flight from the burglary or theft." (Emphasis added.) Kunellis requested an additional instruction stating: "If you conclude that the killing did occur during the commission of the underlying felonies, you may find that the defendant was not responsible for the deaths only if you find that an extraordinary intervening event superseded the defendant's act and became the sole legal cause of death." In refusing the instruction, the court noted:

"The language that the Court has proposed here is straight from [*State v.*] *Hearron* [,228 Kan. 693, 696, 619 P.2d 1157 (1980)]. Language that the defendants have requested in addition to that really says nothing more than a combined application of this instruction and the charging instruction which requires that as element 2, the killing has to be done while in the commission or flight from the underlying felony.

"Instruction 14 simply advises the jury that they're to consider time, distance and the causal relationship as factors in considering whether the killing was done in the commission or flight from the burglary or the theft. These two instructions accomplish, I think, what the defendants have requested. And I think to add anything more to Instruction 14 is duplicative surplusage and added confusion rather than clarifying."

Considering the instructions given as a whole, if the jury believed Rogers' or Sloan's actions were intervening causes, it could — and would — have found Kunellis not guilty. As mentioned, the jury

was charged to consider "[t]ime, distance, and *the causal relationship* between the underlying felony and the killing." (Emphasis added.) As a general rule, juries are presumed to have followed instructions given by the trial court. *State v. Fulton*, 269 Kan. 835, 842, 9 P.3d 18 (2000). The instructions given properly and fairly state the law as applied to the facts of this case and do not need the addition of Kunellis' requested instruction to accomplish that task. There is no real possibility that the denial of that requested instruction changed the outcome of the trial or would change the outcome of the retrial. Accordingly, the trial court did not err in refusing to give it.

Finally, our resolution makes moot an additional issue presented by Kunellis on appeal, *i.e.*, whether allegedly cumulative errors deprived him of his right to a fair trial.

Reversed and remanded for new trial.

ABBOTT, J., not participating.

DAVID S. KNUDSON, J., assigned