IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,946

STATE OF KANSAS,
*Appellee*,

v.

ROBERT WILLARD COLSON,
*Appellant*.

SYLLABUS BY THE COURT

1.

While a conviction cannot be sustained by a presumption based on another presumption—commonly referred to as inference stacking—separate and distinct factual circumstances may be sufficient, when viewed in a light most favorable to the State, to support the drawing of separate inferences.

2.

The mere fact of a victim's intoxication does not provide a presumption that the victim was involved in an altercation at the time of their death.

3.

When evaluating a defendant's intent to permanently deprive a victim of their property in the broader context of an examination of the sufficiency of the evidence supporting a theft conviction, the crucial factual inquiry will be directed to the use the defendant intended when he obtained or exercised unauthorized control over the property. This must usually be inferred from the overt facts and circumstances presented.

1

4.

In this case, sufficient evidence supports a conviction for felony murder based on the underlying theft of a victim's firearm because (a) the defendant was in flight from the theft at the time of the killing; or (b) the killing was sufficiently connected with the theft of the firearm so as to fall within the res gestae of the theft itself.

5.

Absent any evidence of legally sufficient provocation, a jury instruction on voluntary manslaughter is not factually appropriate.

Appeal from Ottawa District Court; RENE S. YOUNG, judge. Opinion filed February 5, 2021. Affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, argued the cause, and was on the briefs for appellant.

*Natalie A. Chalmers,* assistant solicitor general, argued the cause, and *Derek Schmidt,* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: Robert Colson directly appeals his convictions for felony murder, intentional second-degree murder, felony theft of a firearm, felony theft of a vehicle, and burglary arising out of the death of Matt Schoshke on or about August 11, 2017. Colson raises four issues for our consideration: the first three attacking the sufficiency of the evidence supporting his conviction from different perspectives, and the last one challenging the district court's refusal to instruct the jury on voluntary manslaughter as a

lesser included offense of intentional second-degree murder. Finding no error, we affirm Colson's convictions.

FACTS

*The killing of Matt Schoshke*

In August of 2017, Matt Schoshke lived in a rented property about 5 miles to the east of Tescott, Kansas, along K-18 highway. Schoshke's residence was visible from K-18. Schoshke drove a gray 2006 Ford F-150 truck with certain distinguishing characteristics that would, following the events of August 11, 2017, make it easily identifiable to law enforcement. Schoshke lived alone, except for his Australian Shepherd, Zeus. Schoshke's parents, Jan and Gary, lived about 15 to 20 minutes away by car, and on the weekends, Schoshke would usually go over to their house to help with the family ranching operation.

On the evening of August 11, 2017, Schoshke arrived unexpectedly at his parents' home at around 7:30 p.m. Schoshke worked as a delivery driver for FedEx, and was still wearing his work uniform when he arrived. Schoshke ate dinner and visited with his parents, made plans to arrive early the next morning to help bring the bulls in from the pasture, and departed around 8:00 p.m. It was the last time his parents would see him alive.

Around 8:30 p.m. that evening, Schoshke's friend Adam Gorrell was driving with his wife, Amanda, and infant son along K-18, heading to Tescott to get a burger. Adam saw Schoshke's truck heading east, towards Schoshke's house, and waved as their vehicles passed one another. While it was almost dusk and Adam was not completely

3

certain he saw Schoshke in the driver's seat, he believed the driver was Schoshke, and he saw no passengers in Schoshke's truck. Although the Gorrells initially decided to make an impromptu stop at Schoshke's house on their way back home to say hello, their baby had fallen asleep by the time they passed Schoshke's house—where they saw his pickup truck parked—so they decided "just to go on home."

Schoshke was also in communication with some friends who, along with Schoshke's brother Layne, planned to meet up at a bar in Brookville later that evening. Though Schoshke spoke to one of his friends by telephone at around 8:15 p.m. that evening, Schoshke did not show up at the bar, and—somewhat uncharacteristically—failed to answer a text sent at 9:45 p.m. asking where he was. Nor did Schoshke show up to help his family the next morning, although his pickup and Zeus were missing from his home when his brother went by to check on him that afternoon.

As it would turn out, both Zeus and the truck were already several hundred miles to the west by then. Schoshke himself lay dead in his own bathroom, where he was finally found on the evening of August 12. Schoshke had been shot five times by his own .45 caliber handgun, which he normally kept on a bedside table in the adjoining bedroom. He was still wearing his work uniform and carried several keys (including work keys) in his pocket—although not the keys to his truck, which he kept separately. One of the bullets that struck Schoshke first passed through his pocket, fragmenting some of the keys. Investigators believed Schoshke had been standing up facing the toilet—which still contained what investigators believed to be urine—when he was shot. From that position, the left side of his body, where most of the bullets struck, would have been facing the doorway between the bathroom and bedroom.

4

An autopsy classified Schoshke's gunshot wounds as "distant range" based on the absence of soot, stippling, or gunpowder residue. Although the autopsy could not determine the order in which Schoshke received his wounds, the doctor performing the autopsy surmised that two gunshot wounds beneath Schoshke's left armpit likely occurred close together in time and while Schoshke's arm was raised. The autopsy revealed no other blunt force injuries to Schoshke's body. The autopsy also revealed that Schoshke's blood alcohol content (BAC), at the time of his death, was .129. Neither party referenced Schoshke's BAC at trial, although the autopsy report noting it was presented to the jury.

Investigators ultimately recovered five empty .45 caliber cartridge casings from Schoshke's bathroom and bedroom. Two of the casings were located by the dresser on the south wall of the bedroom; the other three were in the bathroom, one of which was found by Schoshke's head. One investigator surmised that the casing found by Schoshke's head might be consistent with a scenario where Schoshke was shot at least once while he was already down.

One of the doorjambs into Schoshke's home had been broken by force, indicating an unauthorized entry. Yet, other than the fact of Schoshke's killing itself, the physical evidence of an intruder's presence was relatively limited. Investigators found several footprint impressions that did not appear to have been left by the shoes Schoshke was wearing when he died. Most of the usable fingerprints investigators observed in the residence matched Schoshke, although the prints taken from Schoshke's body were, themselves, of insufficient quality to rule him out as the source of two prints on the bathroom sink countertop. Furthermore, many of the surfaces swabbed in Schoshke's residence were insufficient to obtain a DNA profile, although DNA found on a Coors Light can found in the residence was consistent with Schoshke's genetic profile.

Complicating matters, a red, size large men's button-down shirt was recovered from the side of K-18, about 3 1/2 miles directly west of Schoshke's residence. Primer gunshot residue was found on the shirt, which also contained at least three DNA profiles—although neither Schoshke nor Colson contributed DNA to the shirt.

*Colson's journey*

On August 7, 2017, Colson used a combination of cash and a credit card to purchase a set of bus tickets that were intended to take him from Bangor, Maine, to Los Angeles, California. This trip included a number of stops and bus changes—including one stop in Junction City and another stop in Salina—and was expected to reach its final destination on August 10, 2017.

On August 10, 2017, Kansas Highway Patrol Trooper Marshall Hageman received a report of a man illegally walking along I-70 between Abilene and Solomon, Kansas. Trooper Hageman saw Colson walking westbound in a ditch at around mile marker 270, about 6 miles east of Solomon, and stopped to speak with him.

Colson presented Trooper Hageman with a Maine I.D. card. He was wearing multiple layers of clothing, including a red collared shirt underneath a white long-sleeved shirt, and shoes with dark tops and white soles. Trooper Hageman could not say for sure whether the red shirt was long- or short-sleeved, nor whether it was a polo-style shirt or a dress shirt. Colson then explained to Trooper Hageman that he was traveling to California for employment prospects. Colson also said that he was trying to reach the next town in order to find a bus stop. Apparently, he had gotten off a bus at the last stop to use the restroom, as he felt sick. He then missed his bus, which had gone on without him.

6

Because walking alongside I-70 is illegal, Hageman drove Colson to Solomon to get him closer to a bus stop, dropping him off at around 7:45 a.m. on August 10. From Solomon, Colson could legally walk to Salina along Old Highway 40.

Colson's presence was next documented around 5:00 a.m., Mountain Time, on August 12, when he purchased gas at a Cenex in Stratton, Colorado. At approximately the same time, surveillance cameras recorded Schoshke's truck pulling into the same Cenex.

At about 1:49 p.m., Mountain Time, the same day, Schoshke's truck was also documented traveling westbound along I-70 towards Grand Junction, Colorado, where a man with Colson's credit card attempted to make a purchase from a Wendy's. The man had a black-and-white dog with him.

Colson continued west, with activity on his credit card in Colorado, Utah, and California on August 12 and August 13. By August 18, the card showed activity in Ventura, California, and the card's last activity occurred on August 25, 2017, in San Luis Obispo, California. Several of Colson's attempted purchases were declined over the course of his journey. Iris Wood—Colson's mother—also had a card associated with the Capital One account used by Colson, although her card had a different set of digits. No one else was on the account.

On the morning of August 14, Los Angeles resident Adam Clark discovered an unfamiliar truck parked outside his home. Clark saw a man—Colson—close the truck door. Colson had a black-and-white Australian Shepherd with him, but his interaction with the dog seemed "odd" because it appeared "as though the dog wanted to get away." Clark never saw Colson in the neighborhood again. Clark observed a beer bottle on the

dash and keys in the center console, neither of which moved as the truck sat there, apparently abandoned.

On August 21, law enforcement located Schoshke's truck in Los Angeles; the KBI was alerted to the discovery on August 23. Although Schoshke never kept the truck pristine, it was usually much cleaner than the state in which it was recovered. In the truck, investigators located a receipt from a gas station in Wilmington, California, which contained a partial credit card number—a number subsequently referred back to KBI investigators and determined to be associated with Colson. The cooler in the truck bed was full of rotting fish and contained no beer cans. The truck bed also contained a Coors Light beer can. The cab contained dry Pedigree dog food, much like the dog food found at Schoshke's house. Zeus enjoyed riding along with Schoshke on his trips to his parents' home, but Schoshke never kept Zeus' food in the truck. Investigators processed various surfaces of the truck for latent fingerprints, many of which were subsequently matched to Colson. Schoshke's fingerprints were not found in his own truck.

The Coors Light beer can recovered from the truck contained DNA consistent with Colson's genetic profile, while the Coors Light can found in Schoshke's house contained DNA consistent with Schoshke's. According to manufacturer's markings on both cans, the two were produced roughly a minute apart at the same plant, and jurors heard testimony that there was "a high possibility" that the cans, which contained "strong beer," were distributed together and would have been obtained from a liquor store.

Investigators also compared a pair of black-and-white K-Swiss shoes—found in Schoshke's truck—with the footprints found in Schoshke's home. Of the eight impressions from Schoshke's home that were usable for comparison, seven corresponded to the "outsole design" and the "approximate physical size" of the K-Swiss shoes. The

shoes could not be identified definitively as the shoes that left the prints because they had no distinctive characteristics, such as a gash or piece missing from the soles. The seven impressions that were consistent with the K-Swiss shoes could have been made by other tennis shoes if they "had that same outsole design," although no evidence was presented that any other shoes shared the outsole design.

On the morning of August 18, 2017, a maintenance worker found a black-and-white Australian Shepherd tied to a post in the courtyard outside of a commercial office building in Ventura, California. Surveillance cameras installed outside the property documented a man arriving with the dog the evening before, tying the dog up outside, and leaving. The dog did not appear to have been mistreated. Eventually, the dog was identified as Zeus and was reunited with Schoshke's parents.

With respect to his views on dogs, Colson's mother described Colson as "an animal lover" who "just is very caring and nurturing" and "loves life," "loves animals," and "loves the earth."

Between 1:00 and 1:30 a.m. Pacific Time on August 25, Pismo Beach Police officers made contact with Colson while on patrol. The officers stopped Colson because his bicycle lacked a headlight, as required by California law. Colson told officers his name was "Willard Colson," though a subsequent consensual search of Colson's belongings revealed to officers that his name was Robert Colson. One of the officers noted that Colson "was acting odd" and "didn't seem to want to be there" because "[h]e was very, very quick to want to end the contact with us and see if he could go about his way." Officers remained with Colson for about 45 minutes, then sent him on his way after Colson activated "a little miner's light" to illuminate himself.

9

Later that evening, Colson was arrested at an Amtrak station in Martinez, California. Colson's possessions—including a Capital One credit card, a page of a handwritten journal, a bus itinerary, bus tickets, and two journals—were subsequently sent to the KBI. Among Colson's journals was a handwritten page, which appears to read:

> "Every thought of how to fix the situation seems improbable[.] 3 days ago I was being hunted in Kansas by 'Coyotes'[;] this morning I brushed my teeth in the Pacific Ocean. I am so grateful and yet so lost and angry."

KBI Senior Special Agent Steve Bundy noted that the handwritten "3" could also be a "5."

Colson also had a cell phone with him during his journey to California, which his mother used to contact him via text messages, telephone, and Facebook Messenger. On August 11, at 12:29 p.m., Wood sent Colson a text indicating that the family had not heard from him in a couple of days. Wood texted Colson again on August 12, at 11:01 p.m., and then again on August 18. In the latter text, Wood indicated that the family had not heard from Colson in over a week and expressed an interest in putting some money on Colson's card, although she was unsure if it had been stolen.

Deon Morrow, a Senior Analyst at Verizon Wireless, provided testimony on cell towers. According to Morrow, if a cell phone call is placed, "the nearest cell tower accesses an antenna" and "grabs the transmission that you are sending and then it passes that on to what we call a switch," which ultimately "determines whether or not that call is valid . . . and then determines where the call should go." Under "ideal circumstances," a call placed "would go to the nearest cell tower." Morrow later clarified that "unideal circumstance[s]" included situations involving "a network outage or problem with the

10

cellular tower that would normally handle that particular call," or when the tower is simply too busy. If a tower registered a phone call, Morrow testified that there was "[a] very high probability that . . . the device at the time of the call is within three miles of that particular tower." However, if the closest tower to a call is not available, "[i]t will seek the next available tower" until it finds a tower capable of handling the call, and phone records "would not indicate that" a call was not handled by the nearest tower. Morrow speculated that, generally, a cell tower in a rural area would not be experiencing so much data usage that the call would have to be transferred elsewhere.

Investigators analyzed the Verizon call records and mapped the locations of the cell towers accessed by Colson's phone over time. These maps documented Colson's travel, starting August 7, from Maine to California. On August 9 and August 10, Colson's phone registered activity north of Junction City, Kansas. Specifically, the last call activity associated with Colson's phone in Kansas involved a cell tower north of Salina, in the direction of K-18, at approximately 12:55 p.m. on August 10. After this, Verizon records show no call activity involving Colson's phone again until August 15, where it was apparently used near Los Angeles.

*Criminal proceedings*

In an Amended Complaint filed January 24, 2018, the State charged Colson with felony murder (Count 2) as an alternative to second-degree intentional murder (Count 1), based on the underlying felony theft of the firearm (Count 3), along with felony theft of a vehicle (Count 4) and a charge of burglary (Count 5). Following a preliminary hearing on January 29, 2018, the district court bound Colson over for trial on all charges.

11

At trial, Colson's attorney moved for a judgment of acquittal based on insufficient evidence at the conclusion of the State's evidence. The district court denied this motion. Colson's attorney also requested a voluntary manslaughter instruction, highlighting the uncertainty as to what actually happened inside Schoshke's house and suggesting that another possible way to construe the facts—besides intentional second-degree murder— would be "that the murder happened as a result of a sudden quarrel." The district court rejected this requested instruction, reasoning that there was no "evidence of a struggle within the house[.]"

In closing arguments, the prosecutor framed Colson's crime as essentially one of opportunity and desperation, highlighting Colson's proximity in the area near Schoshke's house and his need for supplies and transportation, given the unreliable nature of his credit card. The prosecutor speculated that, after killing Schoshke, Colson took the time to take various items from the house in order to ensure the success of his journey, which would account for the presence of Schoshke's clothing and dog food in the truck. To tie Colson to the residence, the prosecutor emphasized the footprints found in Schoshke's house, which were consistent with K-Swiss shoes found in the truck with Colson's DNA on them, and the beer can found in the truck, which was produced close-in-time to the beer can found in Schoshke's house.

In support of the State's theory that Schoshke's killing was intentional, the prosecutor speculated that, "If you'd broken into a rural farmhouse and somebody suddenly comes home, you're going to try to hide and get as far away from that door as possible[,]" noting that "[t]hat back corner of that bedroom is as far away as someone can get." The prosecutor further observed that such a hiding spot was right beside the bedside table, where Schoshke kept his pistol—"And if you crouch behind that dresser, if someone walks towards the bathroom and goes inside, you have a straight shot into

12

someone standing in that bathroom." The prosecutor further highlighted the physical evidence that Schoshke put up no resistance to the shooting.

Colson's closing arguments focused on the absence of any direct evidence that Colson was actually in Schoshke's house. Specifically,

> "Robert Colson is charged, but what evidence puts him in or near that house? What is there? That's the most important thing in this case, obviously. And that's what's missing. It's totally believable that around the time somebody killed Matt Schoshke Robert was in the area walking or hitchhiking . . . . We know that's what he was doing. He was hitchhiking. That he came across a person who did this, with Matt's truck, and a gas station or a rest area or hitchhiking and the person picks him up. That person obviously had the gun and, at some point, could very well have been a local person.

> "We know there are burglaries of farmhouses and outbuildings around this area. We've heard about that. This is not a rare occurrence. Could have been a local person who did this and picked up Robert at some point and then said, Okay, this is where I, this is where I'm done, this is where I get out, you go ahead and keep the truck and head on wherever you're going."

Colson's attorney admitted that the cell tower data suggested that "he was in the area." And he did not dispute that Colson had taken Schoshke's truck to California, or that Schoshke was killed with his own gun. But he attempted to undermine the importance of the shoe prints found in Schoshke's house—which, he suggested, were extremely common—and suggested that the beer in the truck came from the truck's cooler, not from Schoshke's house. He further underscored the strangeness of the State's theory of the case, mocking the notion that someone would kill a homeowner and then take the time to pilfer their clothing and dog food. And he emphasized the lack of any evidence tying the red shirt found on the side of the road to Colson.

13

In rebuttal, the prosecutor noted that the cooler in the back of Schoshke's truck was full of rotting fish, suggesting that the Coors can did not come from the cooler. And the prosecutor noted the evidence that Colson loved dogs, providing a possible explanation for why Colson would have taken Zeus after killing his master: a guilty conscience. Additionally, the prosecutor highlighted the testimony that Colson had been wearing layers of clothing, which could have prevented his DNA from being transferred to the red shirt.

The jury convicted Colson on all counts. The district court subsequently imposed a life sentence, with no parole eligibility for at least 25 years, plus a total of 24 months, to run consecutive. Colson appealed and was permitted to docket his appeal out of time.

ANALYSIS

*Colson's convictions were supported by sufficient evidence.*

Colson's first three arguments each attack the sufficiency of the State's evidence supporting his convictions, albeit from different perspectives. Specifically, Colson argues the evidence was not sufficient to place him at—much less inside—Schoshke's house. He also claims that the jury would have been required to stack inferences to find the necessary mens rea elements for each of his five crimes of conviction in addition to his presence at Schoshke's house. Finally, Colson argues that, under *State v. Kunellis*, 276 Kan. 461, 78 P.3d 776 (2003), the evidence supporting his felony-murder conviction was insufficient because the theft of Schoshke's gun must have been logically completed before Schoshke's killing, and because the evidence did not establish that the thief was fleeing from the theft.

14

*Standard of review*

"When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. This court has also recognized that there is no distinction between direct and circumstantial evidence in terms of probative value. 'A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.' [Citations omitted.]" *State v. Potts*, 304 Kan. 687, 694, 374 P.3d 639 (2016).

Additionally,

"Circumstantial evidence, in order to be sufficient, 'need not rise to that degree of certainty which will exclude any and every other reasonable conclusion.' Instead, circumstantial evidence 'affords a basis for a reasonable inference by the jury' regarding a fact at issue. [Citations omitted.]" *State v. Logsdo*n, 304 Kan. 3, 25, 371 P.3d 836 (2016) (quoting *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 550-51, 431 P.2d 518 [1967]).

A conviction cannot be sustained by "a presumption based upon other presumptions," i.e. by inference stacking. *State v. Banks*, 306 Kan. 854, 859, 397 P.3d 1195 (2017). On the other hand,

"it is permissible for the State to rely on multiple circumstances to support an inference of premeditation, so long as each circumstance has been proved, rather than presumed from another circumstance. In other words, while it is impermissible for a case to rely upon the theory that presumption A leads to presumption B leads to presumption C leads to fact D, it is perfectly proper for the State's case to be grounded upon a theory that presumption

15

A, presumption B, and presumption C all separately point to fact D. [Citations omitted.]"
*Banks*, 306 Kan. at 860-61.

*Discussion*

*The evidence, viewed in a light most favorable to the State, was sufficient to support the jury's finding that Colson was present in Schoshke's home.*

As Colson suggests, none of his DNA or fingerprints were ever found in Schoshke's home, and the State never directly presented evidence as to what he was doing on the day of August 11, 2017. Colson further claims that no evidence supports a finding that he was ever on K-18, let alone near Schoshke's house. Finally, Colson argues that the footprint evidence is far from convincing.

Ignoring the inferences that the jury reasonably could have drawn from Colson's apparent exertion of control over Schoshke's truck, dog, and various personal effects less than 10 hours after Schoshke was last seen alive—and in a location almost 300 miles away from Schoshke's home—the State presented three pieces of evidence that support the jury's finding that Colson was present inside Schoshke's home, when viewed in a light most favorable to the State. First, the State presented evidence that the K-Swiss shoes found in Schoshke's truck and bearing a DNA profile consistent with Colson's were consistent with the footprints left in Schoshke's home—even if it did not demonstrate that those *particular* shoes definitively left the prints found by investigators. While not clear proof of Colson's presence, a reasonable jury could have viewed these consistent shoe prints as an indication that Colson was present in the house. Additionally, Colson was wearing shoes with a similar appearance to the recovered K-Swiss shoes—a dark top and

16

white sole—during his encounter with Trooper Hageman. The jury could have concluded, from this, that Colson wore these shoes before August 11.

Second, the State's evidence that Colson's phone was located near K-18 and that Colson was proceeding on foot after having been dropped by Hageman in Solomon—several miles to the south of K-18—supports the inference that Colson likely headed north and west on foot, rather than following Hageman's advice to follow Old Highway 40 towards Salina. While we note that this activity occurred more than 24 hours prior to the earliest possible time Schoshke could have been killed, that delay, alone, does not invalidate the value of the evidence placing Colson in the general area near Schoshke's home. Additionally, the jury could have interpreted Colson's handwritten journal entry—which mentions that he was "being hunted in Kansas by 'Coyotes'"—as providing circumstantial evidence of difficulties he may have faced in his overland trek, which could have slowed his progress.

We are also unpersuaded by Colson's assertion that the State's argument required an unwarranted assumption to place Colson within 3 miles of the cell tower in question. Specifically, while the evidence showed that a cell phone could access a more distant cell tower if the closest tower was overloaded, the default behavior of cell phones is to access the closest tower available. Additionally, the evidence showed that, while rural cell towers were generally designed to handle less call volume than a more urban tower, the expected call volume in rural areas was also generally less. In any event, the jury could have relied on its own common sense to understand intuitively that the call volume for a tower near the rural intersection of K-18 and US-81 would likely not be so high, on a Thursday afternoon, as to warrant a cell phone call to be rerouted to a more distant tower. Instead, the jury was entitled to rely on the testimony that there was a "very high probability" that Colson's phone was within 3 miles of the cell tower at issue, placing him

17

near K-18. And, as the State highlights, evidence produced at trial demonstrated that Schoshke's residence was visible from K-18, itself.

Finally, the State presented circumstantial evidence that the Coors can found in Schoshke's truck—with Colson's DNA on it—was taken from inside Schoshke's house, rather than from Schoshke's truck cooler itself (which was full of rotten fish). As mentioned earlier, the can contained a factory label suggesting it was created less than a minute apart from another Coors can found in Schoshke's house, which had Schoshke's DNA on it. The evidence also indicated that the dog food found in Schoshke's recovered truck—which, according to his father, Schoshke never stored there—matched the dog food found by investigators in Schoshke's house, further suggesting that Colson actually would have had to go inside to procure it.

The lack of direct evidence placing Colson inside Schoshke's home, indeed, presented a difficult question to the jury. However, when the evidence is viewed in a light most favorable to the State, we find that there was sufficient evidence to support the jury's determination that Colson was the intruder who broke into Schoshke's home and, ultimately, killed him. Despite the lack of direct evidence of Colson's presence, the jury could have inferred his presence in Schoshke's home based on his general proximity to the home, the presence of shoe prints consistent with the shoes he was wearing, and from the presence of his DNA on a can recovered later from Schoshke's truck in California that the jury could have viewed as having been taken from Schoshke's home—along with various articles of Schoshke's clothing and bits of dog food, which, according to Schoshke's father, would not have normally been present in the truck. And the jury could have viewed Colson's journal entry, which suggests a measure of desperation and the need for supplies, as evidence of a possible—if admittedly strange—motive.

18

When parsing the sufficiency of the evidence supporting a conviction, an appellate court does not reweigh the evidence. Our role is to discern whether the evidence presented establishes the foundation for a rational fact-finder to draw reasonable conclusions about past events. If, when viewing the facts adduced at trial in a light most favorable to the State, as the prevailing party at trial, we can discern a logical evidentiary pathway to a jury's conclusion without resorting to impermissible inferential leaps—or, as we will discuss shortly, impermissible inference stacking—then we find sufficient evidence exists to support that conclusion. We find such support here.

*The jury was not required to stack inferences in convicting Colson.*

Because the evidence placing Colson inside Schoshke's home was entirely circumstantial, the jury's implicit conclusion that Colson *was* there was inferential. Colson's second argument, in essence, is that because the jury *also* had to infer the mens rea component of his crimes, such an inference was necessarily stacked atop the jury's inference that he was there in the first place.

We are unconvinced. While the jury's inferences both as to Colson's presence and his culpable mental state were supported by circumstantial evidence, the evidence supporting each inference is separate and distinct; no inference was necessarily presumed based on another presumption. *Banks*, 306 Kan. at 860-61.

We begin by assessing Colson's intentional second-degree murder conviction. A number of facts support the jury's finding that Schoshke's killer—whoever it was—killed Schoshke intentionally. Schoshke was shot four times on his left side (and once on his chin) while in his bathroom. Standing in front of the toilet, Schoshke's left side would have been facing the door from the bathroom into the bedroom, which had been closed

19

behind him after he was shot. Schoshke was still wearing his work uniform and had his work keys in his pocket. His toilet contained what investigators believed to be unflushed urine. An autopsy revealed no additional blunt force trauma to Schoshke's body, beyond his gunshot wounds. Moreover, a spent shell casing was located for each of the five bullets found in Schoshke's body, suggesting that Schoshke's killer did not miss his target. The above evidence supports an inference that Schoshke's killing was the result of an act of intent, rather than recklessness.

Nor was the jury presented with any evidence of a struggle. And while we note Colson's new attempt to highlight Schoshke's postmortem BAC so as to suggest that no one can be truly certain as to what, exactly, precipitated Schoshke's killing, we believe this argument to be irrelevant. The mere fact of a victim's intoxication does not provide a presumption that the victim was involved in an altercation at the time of their death. See *State v. Sherrer*, 259 Kan. 332, 340, 912 P.2d 747 (1996) (For purposes of establishing a sudden quarrel or altercation, "In the absence of evidence that the victim provoked the defendant or that he was likely to provoke when intoxicated or under the influence of drugs, evidence of the level of the victim's drug or alcohol from the KBI toxicology report was not relevant and was properly excluded by the trial judge.").

We next turn to Colson's convictions for the theft of Schoshke's truck and firearm, and thus also his felony-murder conviction. Here, Colson again argues that the uncertainty in the evidence surrounding Schoshke's actions on the night of August 11—including how he reached his apparent state of intoxication—meant that the jury could only have reached a guilty verdict if it also inferred both a taking without authority on Colson's part *and* Colson's intent to permanently deprive Schoshke of his truck and gun.

20

Again, Colson correctly notes the absence of any direct evidence as to what, if any, interaction the intruder(s) had with Schoshke. However, his supposition that anything could have happened—including Schoshke making a "poor decision[]" to give the intruder his gun and truck, under the influence of alcohol—hardly constitutes review of the evidence in a light most favorable to the State.

> "'The intent to deprive permanently must be inferred from the overt facts and circumstances proven. Unless the facts establish an intent to ransom the property back to the owner or to sell or encumber it, the jury must decide in the individual case whether the circumstances intended by the defendant entailed the likelihood that the property would not be restored. *The crucial factual inquiry will be directed to the use the defendant intended when he obtained or exercised unauthorized control.*'" (Emphasis added.) *State v. Warren*, 221 Kan. 10, 13, 557 P.2d 1248 (1976) (quoting Wilson, *Thou Shalt Not Steal: Ruminations on the New Kansas Theft Law*, 20 Kan. L. Rev. 385, 409-10 [1972]).

As with Colson's intentional second-degree murder conviction, separate pieces of indirect evidence—unrelated to the evidence that, we believe, could be viewed as supporting the inference that Colson was inside Schoshke's house—support the inferences of an unauthorized taking and the intent to permanently deprive. With respect to the taking of Schoshke's gun, the most obvious indication of unauthorized access and intent to permanently deprive lies in the fact of—and the physical evidence surrounding—Schoshke's killing, itself. It is difficult to envision a more permanent deprivation of a firearm than one accomplished by fatally shooting the firearm's owner with it. Moreover, everything about the way Schoshke was killed suggested that he was unaware of a threat at all, supporting the inference that whoever obtained control of his gun—which, the evidence showed, was usually on his bedside table—did so without Schoshke's knowledge, much less his permission. And while Colson posits that Schoshke

21

may have simply *given* the intruder his loaded weapon, the mere fact of intoxication, with nothing more, is insufficient to make such a scenario plausible.

The above analysis also applies to the theft of Schoshke's truck. Additionally, while the ultimate fate of Schoshke's gun is unknown, everything about Colson's conduct with respect to the truck indicates that it was merely a means to an end, culminating with his decision to permanently abandon it once he reached California.

Turning to Colson's burglary conviction, Colson argues that no evidence exists to demonstrate that the individual who broke into Schoshke's house did so with an intent to commit a theft. Here, at least some of the evidence supporting an inference that the intruder broke into Schoshke's home with the intent to commit theft overlaps with the evidence tying Colson to Schoshke's home—specifically, the items found in the truck, including the beer can and dog food, which appear to have come from inside Schoshke's home. However, when evaluating the sufficiency of the evidence supporting a finding that an intruder broke into a building with the intent to commit a theft, we must also consider the circumstances of the break-in itself.

> "Assume that an accused, a lone backpacker in a rural area, ignores a prominently posted 'No Trespassing' sign and steps inside the open door of an empty barn in order to gain shelter from a sudden downpour at midday. Such facts, standing alone, could not reasonably give rise to an inference that the trespasser entered with theft in mind. Assume, however, that the accused breaks the lock on a rear door and enters a pharmacy or a jewelry store at midnight, and shortly thereafter is found concealing himself inside the store. Is not an inference of intent to commit a theft logical?
>
> "The intent with which an entry is made is rarely susceptible of direct proof; it is usually inferred from the surrounding facts and circumstances. The manner of the entry,

22

the time of day, the character and contents of the building, the person's actions after entry, the totality of the surrounding circumstances, and the intruder's explanation, if he or she decides to give one, are all important in determining whether an inference arises that the intruder intended to commit a theft. [Citations omitted.]" *State v. Harper*, 235 Kan. 825, 828-29, 685 P.2d 850 (1984).

Here, again, no direct evidence of the timing of the break-in was presented. The State's theory of the case posited that Colson broke in while the house was unoccupied— but while that, indeed, appears to be the most logical inference, it cannot be used to support an *additional* inference that, therefore, the break-in was committed with the intent to commit a theft. However, the intruder's ultimate post-break-in conduct *is* known: Schoshke was shot five times and his firearm was taken. From that known conduct, the jury could have inferred an *initial* intent to break in with the intent to commit a theft. Consequently, we find that no inference stacking was necessary in order to enable the jury to reach its conclusions.

*The evidence was sufficient to demonstrate that Schoshke's killing was either within the res gestae of the theft of his firearm or committed while the thief was in flight.*

Colson's contention that the crime of theft of Schoshke's firearm had already been completed by the time the murder occurred primarily relies on *Kunellis*, 276 Kan. 461. In *Kunellis*, the court agreed with the defendant's position that "theft is complete when a person takes unauthorized possession of the property of another" and that "a conviction for felony murder based upon a death occurring after the 'commission' of the theft, without more, cannot stand." 276 Kan. at 468. Instead, "conviction for a felony murder following that theft can only be based upon 'flight from' that completed crime." 276 Kan. at 468. However, as emphasized in subsequent opinions, "Kunellis must be restricted to

23

its peculiar facts" because "[i]nstead of prosecuting Kunellis for the deaths as felony murders that occurred in flight from the theft, the State pursued the theory that the theft was a continuing offense" when, "[a]s a matter of law, the theft was not a continuing offense." *State v. Griffin*, 279 Kan. 634, 656, 112 P.3d 862 (2005).

As the court has clarified:

"The felony-murder statute requires two elements of causation. First, the death must occur within the res gestae of the underlying felony. Second, there must be a direct causal connection between the felony and the homicide. Res gestae refers to acts that occurred 'before, during, or after the happening of the principal occurrence when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence.' A direct causal connection exists unless an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death.

"There are three factors examined in determining whether a direct causal connection is present: time, distance, and the causal relationship between the underlying felony and the killing. [Citations omitted.]" *State v. Phillips*, 295 Kan. 929, 940-41, 287 P.3d 245 (2012).

Here, contrary to Colson's characterization, the prosecutor did not suggest that the theft of the firearm was so divorced from the shooting, itself, as to fall into the legally infirm category of "ongoing" thefts proscribed by *Kunellis*:

"Think about the evidence. Colson kills Matt shortly after he arrives home, 8:30 on the 11th. He had to have surprised him. He had to have been lying in wait. *The Springfield .45 XD had to have been sitting there in the bedroom because that's where Matt normally kept it. And so when Matt comes home, he grabs it*, and he shoots Matt five times as he's in the bathroom. Not once, not an accident. Five times. . . .

24

. . . .

"So what is the evidence that he intentionally killed Matt? Think about where the evidence is in the house. *If you'd broken into a rural farmhouse and somebody suddenly comes home, you're going to try to hide and get as far away from that door as possible.* That back corner of that bedroom is as far away as someone can get. *Right next to you is a dresser and a side table by a bed that has a .45 laying on it.* And if you crouch behind that dresser, if someone walks towards the bathroom and goes inside, you have a straight shot into someone standing in that bathroom.

"The physical evidence of the shell casings that begin right there, the bottom of that dresser, and then proceed towards the bathroom and in the bathroom support the argument that the defendant was laying in wait, Matt came home, he went into his bathroom, and, as he was standing there, startled him as he raised his hands, he shot him twice on the side, he shot him once in the front, in the thigh, and then, as he falls, he gets shot in the chin.

"The physical evidence in those two rooms support the fact that all Matt did was stand in his own bathroom as the defendant held that Springfield .45 with the grip safety in it tight so that it would automatically shoot one, two, three, four, five. That is an intentional act. He intentionally killed him." (Emphases added.)

Thus, contrary to Colson's characterization, the State's theory of the case makes the act of shooting Schoshke essentially inseparable from the theft of the firearm—which itself was, the State postulated, picked up immediately before the shooting, as Colson hid from Schoshke. Under this theory, the act of the shooting is sufficiently causally connected with the theft of the firearm so as to fall within the res gestae of the theft itself.

Even if the court were to accept Colson's argument that, under *Kunellis*, the theft of the firearm had been completed at the time of the shooting, Colson's argument that the

25

shooter was not in "flight" from the felony theft is misplaced. For support, Colson relies entirely on the prosecutor's remarks to the effect that the shooter was lying in wait. As demonstrated by the excerpt of the prosecutor's argument set forth above, however, we believe this reading mischaracterizes the overall thrust of the prosecutor's remarks: that Colson essentially committed the theft and shot Schoshke as a means of escaping detection by the resident of the home he had broken into. Under this reading of the evidence, even if Colson was correct that the theft was completed the instant he picked up the gun, the shooting of Schoshke formed the means by which he intended to escape from the premises, i.e., by removing his only obstacle. The same would have been true if, for instance, he had run Schoshke over while fleeing in his truck, rather than shooting him with his own gun.

For purposes of evaluating the sufficiency of the evidence—and because the State charged that the killing occurred during the theft or, alternatively, while in flight from said theft—we need not tease apart the distinction between the res gestae of the killing and the flight from the commission of the theft. We are satisfied that either theory was supported by sufficient evidence here.

*The district court did not err in denying Colson's request for a lesser included offense instruction on voluntary manslaughter.*

Finally, Colson argues the district court erred in refusing to instruct the jury on voluntary manslaughter as a lesser included offense of intentional second-degree murder, claiming that the evidence could have supported a jury's finding that a sudden quarrel existed.

*Standard of review*

When presented with a claim that a district court has committed an error by refusing to issue a jury instruction:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012)]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

"The first element of this analysis ultimately affects the last one 'in that whether a party has preserved an issue for review will have an impact on the standard by which we determine whether an error is reversible.'" *State v. Ross*, 310 Kan. 216, 223, 445 P.3d 726 (2019) (quoting *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 [2015]). Because Colson's trial counsel requested an instruction on voluntary manslaughter as a lesser included offense of intentional second-degree murder, the harmlessness standard set forth in *Ward*—rather than clear error—applies. *Barber*, 302 Kan. at 377-79.

*Discussion*

Voluntary manslaughter, under K.S.A. 2019 Supp. 21-5404, is a lesser included offense of intentional second-degree murder, under K.S.A. 2019 Supp. 21-5403(a)(1).

27

See, e.g., *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008). Thus, the requested instruction would have been legally appropriate.

However, as this court recently summarized:

"[W]hen evaluating the factual appropriateness of a voluntary manslaughter instruction, courts consider whether there was 'an adequate provocation that deprives a reasonable person of self-control and causes that person to act out of passion rather than reason.' Under this framework, 'Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter.' Additionally, 'Whether provocation was legally sufficient is based on an objective standard.' [Citations omitted.]" *State v. Uk*, 311 Kan. 393, 397-98, 461 P.3d 32 (2020).

Here, no evidence was presented as to the existence of an altercation between the shooter and Schoshke, let alone one of legally sufficient provocation. Instead, the evidence suggested that Schoshke's killer simply ambushed him with his own firearm, while Schoshke was unaware of the killer's presence—or, at least, of the threat the killer posed. Lacking any evidence of legally sufficient provocation, an instruction on voluntary manslaughter would not have been factually appropriate. *Uk*, 311 Kan. at 398-99.

In order to compensate for this deficit, Colson attempts, again, to inject Schoshke's inexplicably elevated postmortem BAC into the discussion. But for the reasons discussed above, this approach is fruitless. See *Sherrer*, 259 Kan. at 340. Thus, we find no error in the district court's refusal to instruct the jury on voluntary manslaughter.

28

CONCLUSION

It is not our role to divine the precise nature of the events that precipitated the killing of Matt Schoshke; that is the function of the trier of fact. Our role is to evaluate—guided by the parties' arguments—whether the trier of fact's labors were infected by error or unfairness, whatever its nature. Finding no such infection here, we affirm Colson's convictions.

JANETTE L. SATTERFIELD, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  District Judge Satterfield was appointed to hear case No. 120,946 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Justice Carol A. Beier.