NOT DESIGNATED FOR PUBLICATION

No. 123,553

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TYLER C. PENN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC WILLIAMS, judge. Opinion filed February 18, 2022. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Boyd K. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before CLINE, P.J., GREEN, J., and PATRICK D. MCANANY, S.J.

PER CURIAM: Tyler C. Penn challenges the sufficiency of the evidence supporting the district court's revocation of his probation and the legality of his underlying prison sentence. We find sufficient evidence supports the district court's decision, and Penn's sentence was legal when ordered. We affirm both the district court's revocation of Penn's probation and his sentence.

1

After Penn pleaded guilty to three crimes that occurred in March 2019, he was sentenced in accordance with a plea agreement. The district court granted Penn's motion for dispositional departure and sentenced him to 24 months' probation, with underlying prison and jail sentences.

In November 2019, the district court extended Penn's probation by 24 months and imposed a 60-day jail sanction after Penn admitted to violating his probation by committing a new crime.

In August 2020, the State filed a warrant alleging that Penn had violated the terms of his probation again. This time, the State alleged that Penn had committed the offenses of battery, domestic battery, battery against a law enforcement officer, and possession of a firearm.

At Penn's probation violation hearing, Rocheal Wallace-Kirk, Penn's mother-in-law, testified. She claimed that she received a call after midnight from her grandchildren. Her grandson told her to "come get us now." Wallace-Kirk went to Penn's residence and entered the house.

Upon entering the home, Wallace-Kirk encountered one of her granddaughters and picked her up, holding her in her arms as she made her way through the residence. Once she made it to the back of the house, she encountered her daughter, Penn's wife, standing in the doorway of the bedroom. Wallace-Kirk testified that Penn then emerged from the bedroom, visibly inebriated, and punched his wife several times in the face. According to Wallace-Kirk, Penn then punched Wallace-Kirk in the face while she was holding the baby. Wallace-Kirk testified that Penn then tried to get in his car and leave, but she followed him outside and parked her car behind his car so that he could not leave.

Wallace-Kirk stated that her nose was bleeding and very swollen after the incident, and she thought it might be broken. She testified that she received treatment at the hospital for her injuries. She also said that, earlier that day, she had seen Penn in possession of a handgun at the house. She believed he kept this handgun at his business.

Wichita Police Officer Ryan Oliphant, who interviewed Wallace-Kirk at the hospital, also testified. Officer Oliphant said when he encountered Wallace-Kirk at the hospital, she had no visible injuries. He said Wallace-Kirk told him Penn hit her, and she had also seen Penn strike her daughter. He testified she told him that when she first arrived at Penn's house the door was open. She said she saw Penn kick her daughter and entered the home in response. Officer Oliphant also stated while interviewing Wallace-Kirk, they could hear Penn, who was in the emergency room as well, yelling at another officer. Officer Oliphant testified that Wallace-Kirk appeared visibly shaken in response to the sound of Penn yelling. Officer Oliphant said once he left the room where he interviewed Wallace-Kirk, he observed Penn standing up and walking around, yelling and pointing at the officer.

Penn was the last witness to testify. He said that, on the day of the incident, he and his wife had attended a cookout at a friend's house. He claimed Wallace-Kirk had been calling them all day. After they returned home, Wallace-Kirk showed up at his house. According to Penn, Wallace-Kirk often showed up unannounced to their home, inebriated. He said Wallace-Kirk walked into the bedroom, inebriated and holding a handgun, "mad about some money or some stuff with [Penn's] wife." While Wallace-Kirk was arguing with his wife, Penn claimed he grabbed the gun out of her hand and threw it over the bed. Wallace-Kirk then picked up a large glass vase that was sitting nearby and struck him over the head with it. Penn denied hitting Wallace-Kirk or his wife.

Penn testified the blow to his head caused severe bleeding. As he tried to make his way outside, he lost consciousness. He said when he regained consciousness he was in an

ambulance on the way to the hospital. Penn claimed that as a result of the blow to his head, he received lacerations to his head, neck, and shoulders. Penn claimed he received staples in his scalp and stiches in his neck and shoulders at the hospital.

Penn admitted to cussing at a police officer while at the hospital but denied balling his fist at the officer or slapping the officer on the arm. Penn said he was angry with the officer because the officer was asking him questions while doctors were stapling his scalp, and because the officer told him that he was not a victim.

When asked on cross-examination, Wallace-Kirk denied hitting Penn at any point on the day of the incident.

Following witness testimony, the State withdrew the allegation of battery against a police officer and asked the district court to find Penn violated his probation based on the three remaining allegations. The State urged the district court to find Wallace-Kirk's testimony credible based on Officer Oliphant's testimony that she appeared scared of the sound of Penn's voice. The State asked the district court to find Penn's testimony unreliable because of what he had to lose if found to have violated his probation. Defense counsel argued Wallace-Kirk's reaction to the sound of Penn's voice did not necessarily mean she was telling the truth on the stand. He then noted the standard of proof necessary to establish a probation violation was "incredibly low" but urged the district court to find that Penn did not violate his probation.

Based on Wallace-Kirk's and Officer Oliphant's testimony, the district court found that Penn committed the offenses of battery, domestic battery, and possession of a firearm, and revoked Penn's probation. The district court found Wallace-Kirk's testimony was credible and backed up by Officer Oliphant's testimony about Penn's demeanor at the hospital and Wallace-Kirk's reaction to Penn's voice. The district court also made a finding that Wallace-Kirk's version of events was more credible than Penn's self-serving

version of events. In revoking Penn's probation, the district court found Penn was not amenable to probation, had committed new criminal offenses, and was a danger to the community based on the nature of the violations. The district court imposed the underlying prison and jail sentences.

On appeal, Penn argues the district court erred by finding that he violated the terms of his probation.

ANALYSIS

Penn first challenges the sufficiency of the evidence supporting the district court's finding that he violated his probation. Although the initial decision to impose probation is an act of grace by the district court, once a defendant is placed on probation, he or she acquires a conditional liberty interest which is subject to substantive and procedural due process limits on its revocation. So a probationer may not have his or her probation revoked unless the State shows that the probationer has violated one of the conditions of probation. *State v. Hurley*, 303 Kan. 575, 581, 363 P.3d 1095 (2016). Yet the State need not establish commission of the violation by proof beyond a reasonable doubt. Rather, the State need only establish the violation by a preponderance of the evidence. *State v. Gumfory*, 281 Kan. 1168, 1170, 135 P.3d 1191 (2006). A "preponderance of the evidence" means evidence sufficient to show a fact is more probably true than not true. *In re Estate of Moore*, 310 Kan. 557, 565, 448 P.3d 425 (2019).

Appellate courts review a district court's factual finding that a probation violation occurred for substantial competent evidence. *State v. Inkelaar*, 38 Kan. App. 2d 312, 315, 164 P.3d 844 (2007). Substantial competent evidence is legal and relevant evidence that a reasonable person might accept as sufficient to support a conclusion. *State v. Luna*, 271 Kan. 573, 574-75, 24 P.3d 125 (2001).

5

In addressing challenges to the sufficiency of the evidence, we review the evidence in the light most favorable to the State to determine whether a rational fact-finder could have come to the same conclusion as the fact-finder below. *State v. Colson*, 312 Kan. 739, 753, 480 P.3d 167 (2021). We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

The district court weighed the credibility of the witnesses here and resolved their conflicting stories, finding Wallace-Kirk's testimony was more credible than Penn's self-serving version of events. While Penn acknowledges that we must defer to the district court's credibility findings, he argues the district court relied on the uncorroborated testimony of a single witness (Wallace-Kirk). He says we must review her testimony to determine if it is so unbelievable as to not be able to sustain the district court's findings. In support of this argument, Penn cites *State v. Matlock*, 233 Kan. 1, 4, 660 P.2d 945 (1983), where the Kansas Supreme Court held that the uncorroborated testimony of a prosecutrix was so unbelievable that it was insufficient to sustain a rape conviction. Penn argues that since Wallace-Kirk's testimony was uncorroborated and refuted by Officer Oliphant's independent testimony, we should apply *Matlock* and hold that Wallace-Kirk's testimony could not sustain the district court's finding.

As the State points out, however, *Matlock* involved the reasonable doubt standard applicable to criminal convictions. The State argues that since the full panoply of rights due in a criminal prosecution do not apply to a probation revocation, *Matlock* is inapplicable. See *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).

In announcing its ruling, the court in *Matlock* explained that it was not repudiating the rule that the uncorroborated testimony of a witness can convict a defendant of rape. "However, that rule has always been subject to the rule that her testimony must be

convincing to the point that a rational factfinder could find the defendant guilty beyond a reasonable doubt. Here, we do not believe the testimony rises to that level." *Matlock*, 233 Kan. at 6. Since the court's ruling hinged on the reasonable doubt standard of proof, the State is correct in arguing that *Matlock* is distinguishable. The high standard of proof required to convict Matlock of rape meant that the uncorroborated witness testimony was not sufficient to sustain his conviction, given the weight of the countervailing evidence. That same high standard of proof does not apply here.

Furthermore, since *Matlock*, the Kansas Supreme Court has characterized the ruling in that case as "aberrant," noting that it "is perhaps the only case of its kind in this state where the Supreme Court directly weighed the evidence and assessed the credibility of the prosecutrix to reverse a conviction for rape." *State v. Brinklow*, 288 Kan. 39, 53, 200 P.3d 1225 (2009). Thus, we decline to apply it.

For us to grant Penn the relief he requests, we would have to reweigh the evidence, resolve conflicts in the testimony, and find that Penn's testimony was more credible than Wallace-Kirk's. We have no authority to do any of those things. Penn cannot overcome the district court's explicit finding that Wallace-Kirk's testimony was more credible than his own. If Wallace-Kirk's testimony is to be believed, it establishes that Penn violated the terms of his probation.

Viewing Wallace-Kirk's testimony in the light most favorable to the State, as we must, we find a rational fact-finder could have concluded that Penn violated the terms of his probation. We affirm the district court's revocation of his probation.

Penn next argues the district court erred by including his prior conviction for criminal threat in calculating his criminal history score for his original sentencing.

Penn concedes that he did not object below to the inclusion of his prior criminal threat conviction in his criminal history score but argues that he may raise this issue for the first time in an appeal because an illegal sentence may be corrected at any time. K.S.A. 2020 Supp. 22-3504(a) authorizes a court to "correct an illegal sentence at any time." This language has been interpreted to mean that a challenge to the classification of a prior conviction or adjudication to lower a defendant's criminal history score can be raised for first time on appeal. *State v. Dickey*, 301 Kan. 1018, 1034, 350 P.3d 1054 (2015). So we may consider this issue, even though Penn raises it for the first time on appeal.

Whether a district court properly classified a defendant's prior crimes for sentencing presents a question of law over which appellate courts have unlimited review. *State v. Bradford*, 311 Kan. 747, 750, 466 P.3d 930 (2020).

A sentence is illegal if it (1) is imposed by a court lacking jurisdiction, (2) fails to conform to the applicable statutory provisions, or (3) is ambiguous on the time and manner that the sentence is to be served. "A sentence is not an 'illegal sentence' because of a change in the law that occurs after the sentence is pronounced." K.S.A. 2020 Supp. 22-3504(c)(1). A "'[c]hange in the law'" is defined as "a statutory change or an opinion by an appellate court of the state of Kansas, unless the opinion is issued while the sentence is pending an appeal from the judgment of conviction." K.S.A. 2020 Supp. 22-3504(c)(2).

The legality of a sentence is thus fixed at a discrete moment in time—the moment the sentence was pronounced. At that moment, the sentence is either legal or illegal according to then-existing law. For purposes of a motion to correct an illegal sentence, neither party can avail itself of later changes in the law. The only exception to this rule is that a defendant receives the benefit of a change in the law if it occurs while a direct appeal is pending, because a sentence is not final until the direct appeal is completed. *State v. Murdock*, 309 Kan. 585, 591, 439 P.3d 307 (2019).

The district court sentenced Penn on September 18, 2019. Penn did not timely appeal his sentence, so by law his sentence became final 14 days after it was pronounced from the bench. See K.S.A. 2020 Supp. 22-3608(c).

Penn's criminal history worksheet included a 2014 conviction for criminal threat. Kansas' criminal threat statute criminalizes threats made "with intent to place another in fear" as well as threats made "in reckless disregard of the risk of causing such fear." K.S.A. 2020 Supp. 21-5415(a)(1). On October 25, 2019, the Kansas Supreme Court held that the "reckless disregard" provision of Kansas' criminal threat statute is unconstitutionally overbroad. *State v. Boettger*, 310 Kan. 800, 822, 450 P.3d 805 (2019). Penn's criminal history worksheet does not reveal whether Penn was convicted of intentional or reckless criminal threat.

Penn acknowledges that *Boettger* was decided after his sentence was final and that another panel of this court has already addressed this issue and held that *Boettger* was a change in the law, precluding defendants sentenced before the date it was decided from gaining its benefit under *Murdock*. See *State v. Miller*, No. 121,792, 2020 WL 6533257, at *4 (Kan. App. 2020) (unpublished opinion), *rev. denied* 313 Kan. 1045 (2021). Penn argues that *Miller* was wrongly decided and urges this panel to reach a different conclusion in his case.

In support of his position, Penn argues that (1) *Boettger* was a straightforward application of *Virginia v. Black*, 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003), and therefore his sentence was still illegal when pronounced, even though *Boettger* had not yet been decided; (2) application of K.S.A. 2020 Supp. 21-6810(d)(9) provides for relief; and (3) because the district court maintained jurisdiction to modify his sentence upon revocation of his probation, his sentence was not truly final until imposed by the district court upon the revocation of his probation in November 2020.

9

As the State points out, *Miller* directly addressed and rejected the first two of Penn's arguments. In *Miller*, the panel analyzed both *Boettger* and *Black*, explaining that while the court relied on *Black* in deciding *Boettger*, it was *Boettger*, not *Black*, that declared the Kansas reckless criminal threat statute unconstitutional. *Miller*, 2020 WL 6533257, at *4. As a result, *Boettger* qualifies as a change in the law under K.S.A. 2020 Supp. 22-3504 and does not render Penn's sentence illegal. The panel also rejected the argument that K.S.A. 2020 Supp. 21-6810(d)(9) provides relief for defendants sentenced before the *Boettger* decision. K.S.A. 2020 Supp. 21-6810(d)(9) states that "[p]rior convictions of a crime defined by a statute that has since been determined unconstitutional by an appellate court shall not be used for criminal history scoring purposes." But as the panel in *Miller* explained, this provision does not grant defendants perpetual relief from a sentence that was legal when it was pronounced. Under K.S.A. 2020 Supp. 22-3504 and *Murdock*, the legality of a defendants' sentence is determined based on the law in effect when the sentence was pronounced. *Miller*, 2020 WL 6533257, at *4. K.S.A. 2020 Supp. 21-6810(d)(9) only prevents including convictions under statutes that have been found unconstitutional before the time a defendant's sentence is pronounced. It does not provide defendants an end run around the rule set forth in K.S.A. 2020 Supp. 22-3504 and *Murdock*. The analysis in *Miller* is equally applicable here, so we reject Penn's first two arguments.

Penn's third argument also fails. K.S.A. 2020 Supp. 22-3716(c)(1)(C) provides that if a probation violation is established, a district court may revoke the violator's probation and require "such violator to serve the sentence imposed, or any lesser sentence." That said, while a district court maintains jurisdiction to modify a probationer's sentence under K.S.A. 2020 Supp. 22-3716, that does not mean the probationer's sentence is not final until imposed on revocation of probation. Unless a defendant appeals his or her sentence directly, it becomes final by law 14 days after it was pronounced from the bench. See K.S.A. 2020 Supp. 22-3608(c). At that moment in time, it is either legal or illegal, as instructed by *Murdock*.

Since *Boettger*'s change of the law occurred after Penn's sentence was pronounced and became final, we find that Penn's sentence is legal.

Affirmed.